**Affirmed and Opinion filed September 29, 2011.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-10-00084-CV

_____

### WHITE OAK OPERATING COMPANY, LLC, Appellant

### V.

### BLR CONSTRUCTION COMPANIES, LLC N/K/A STALLION OILFIELD CONSTRUCTION, LLC, Appellee

**On Appeal from the 55th District Court
Harris County, Texas
Trial Court Cause No. 2007-60434**

## O P I N I O N

An oilfield service company sued an oilfield operator for breach of a master service agreement based upon the operator's failure to pay an invoice for services rendered following the blowout of a well located in Louisiana. The operator counterclaimed, asserting that the service company breached an oral contract between the parties under which the service company allegedly promised to pay the operator for all costs incurred

and damage sustained as a result of the blowout. The operator alleged, in the alternative, fraud based upon an allegation that the service company made this promise with an intent not to perform. The jury found that the operator breached the master service agreement by failing to pay the invoice. The jury also determined that the preponderance of the evidence does not support a finding that (1) the parties entered into the oral contract, (2) the service company committed fraud, or (3) the service company failed to perform its work with due diligence and in a good and workmanlike manner. On appeal, the operator challenges the legal and factual sufficiency of the evidence as to these four findings. Concluding that legally and factually sufficient evidence supports these findings, we affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2005, appellant/defendant/counter-plaintiff White Oak Operating Company, LLC ("White Oak") entered into a "Master Service Agreement" ("Master Agreement") with appellee/plaintiff/counter-defendant BLR Construction Companies, LLC n/k/a Stallion Oilfield Construction, LLC ("Stallion"). Under section 8 of the Master Agreement, regardless of whether Stallion caused the loss or was negligent, White Oak (1) "shall be liable for the cost of regaining control of any wild well, as well as for cost of removal of any debris," and (2) "shall assume all responsibility for, including control and removal of, and protect, defend, indemnify and save [Stallion] harmless from and against all claims, demands and causes of action of every kind and character arising directly or indirectly from all . . . pollution or contamination which may occur during the conduct of operations hereunder [other than certain pollution or contamination not relevant in the case under review], including, but not limited to, that which may result from . . . blowout . . . or any other uncontrolled flow of oil, gas, water or other substance."

White Oak is the operator of the Lawton #3 well located in Louisiana ("Well"). The Well was completed in February 2007 and was capped in anticipation of the installation of production equipment. During this time, Stallion provided various services to White Oak regarding the Well under the Master Agreement, including building the

2

"location," laying mats, and permatizing.   To perform the permatizing work in question, a Stallion bulldozer operator had to spread crushed limestone around the well site up to the edge of the cellar.   On May 23, 2007, Roland Duhon, a Stallion employee, was performing permatizing work with a bulldozer at the Well.   Duhon was the only person at the Well. While Duhon was performing this work, he noticed what he described as "a small blue plume, which was about 5 or 6 feet high, between . . . the Christmas tree and the spool that the Christmas tree was attached to."   Duhon testified that he called a Stallion office and told Todd Miller that he thought he might have hit the wellhead and that it was leaking. Miller asked Duhon if Duhon could turn it off.   But the leak was below the master valve, so Duhon told Miller that there was no valve by which Duhon could shut it off.   Duhon talked to Ronnie Powell, Stallion's safety director, and told him he thought he might have hit the wellhead.   The Well continued to leak, leading to a blowout and a wild well.

On May 23, 2007, Powell arrived at the site of the Well, as did Tommy Angelle, the sales manager for Stallion's construction department.   Joe Lauer, a White Oak employee, also arrived on the site that day.   There was testimony at trial that (1) Angelle told Lauer that Stallion would provide services in response to the blowout free of charge; and (2) after receiving approval from Mike Rayburn, White Oak's executive vice president, Lauer agreed that Stallion could provide services in response to the blowout free of charge.

White Oak has asserted that, based upon statements made by Duhon, Powell, and Angelle to Lauer on May 23, 2007, Stallion and White Oak entered into an oral contract, separate from the Master Agreement, under which Stallion promised to pay White Oak for all costs incurred and damage sustained by White Oak as a result of the blowout ("Alleged Agreement").   White Oak asserts that, under the Alleged Agreement, White Oak promised to (1) forebear any claims it had against Stallion regarding the blowout, (2) allow Stallion to use its own equipment and personnel to minimize the cost to Stallion of controlling the Well, repairing the damage, and containing and cleaning up the pollution and contamination, and (3) keep Stallion on White Oak's approved vendor list so that Stallion could continue to do business with White Oak.   White Oak contends that, under the

3

Alleged Agreement, Stallion agreed to pay for the services rendered by third parties in response to the blowout and for damage to the Well.

Stallion and other contractors provided services over the next four days. By May 27, 2007, the Well was under control. White Oak put a new wellhead on the Well, and at the time of trial the Well was White Oak's "biggest producer."

Stallion's Chief Executive Officer, Craig Johnson, testified that, on May 23, 2007, he and others at Stallion were unaware of the existence of the Master Agreement and that they did not become aware of this agreement until several months later. Johnson also testified that Stallion notified its insurance carrier of the blowout on May 23, 2007, and that Johnson and others at Stallion believed that Stallion's insurance would cover the costs of Stallion's liability regarding the blowout.

White Oak paid third-party contractors for services regarding well control, restoration and repair of the Well, and pollution clean up. These third-party charges total approximately $956,000. White Oak sought payment from Stallion to cover the cost of these third-party services. Johnson, Angelle, and Rayburn met on August 17, 2007, to discuss the third-party invoices. Johnson testified at trial that, on August 17, 2007, he was ready to sign a check to pay for White Oak's third party costs. Shortly after this meeting, Johnson obtained a copy of the Master Agreement. In addition, after this meeting, Johnson learned that there was no insurance coverage due to the terms of the Master Agreement. Stallion then refused to pay White Oak for the third-party costs.

Stallion sued White Oak on October 2, 2007, in the trial court below. Later, on May 12, 2008, White Oak received for the first time an invoice from Stallion requesting payment for the goods and services rendered by Stallion in response to the blowout of the Well ("Post-Blowout Services"). The invoice was dated August 1, 2007. In this invoice, Stallion sought payment in the amount of $357,193.12 ("Invoice"). In an amended petition, Stallion alleged that White Oak breached its obligations to Stallion under section 8 of the Master Agreement and that White Oak was liable to Stallion based upon White

4

Oak's failure to pay for the Post-Blowout Services. In its counterclaim, White Oak asserted, among other things, that Stallion breached an oral contract between the parties under which Stallion allegedly promised to pay White Oak for all costs incurred and damage sustained as a result of the blowout. In the alternative, White Oak alleged fraud based upon an allegation that Stallion made this promise with an intent not to perform.

The case proceeded to trial before a jury. The jury found as follows:

- White Oak failed to comply with the Master Agreement by failing to pay the Invoice, and this failure to comply was not excused.

- $357,193.12, if paid now in cash, would fairly and reasonably compensate Stallion for its damages that resulted from this failure to comply.

- White Oak failed to comply with the Master Agreement by failing to defend and indemnify Stallion, and this failure to comply was not excused.

- $0, if paid now in cash, would fairly and reasonably compensate Stallion for its damages that resulted from this failure to comply.

- Stallion and White Oak did not enter into the Alleged Agreement on May 23, 2007.

- Stallion did not fail to perform the permatizing work on the Well with due diligence and in a good and workmanlike manner to completion in accordance with the Master Agreement.

- Stallion's negligence, if any, did not proximately cause the May 23, 2007 blowout.

- Stallion did not commit fraud against White Oak.

Though both parties had requested attorney's fees, they did not try these requests to the jury. Instead, they relied upon stipulations as to what reasonable attorney's fees would be for each party. At Stallion's request, the trial court rendered judgment on the jury's verdict, ordering that White Oak take nothing from Stallion and that Stallion recover from

5

White Oak $357,193.12, prejudgment interest, and reasonable and necessary trial and appellate attorney's fees in the amounts to which the parties had stipulated. The trial court denied White Oak's motions for judgment notwithstanding the verdict and for new trial.

## II. STANDARDS OF REVIEW

On appeal, White Oak challenges the legal and factual sufficiency of the evidence supporting various jury findings. When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* The factfinder is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819.

When reviewing a challenge to the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 615–16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). We may not substitute our own judgment for that of the trier of fact, even if we would reach a different answer on the evidence. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Pascouet*, 61 S.W.3d at 616.

6

## III. ISSUES AND ANALYSIS

### A. Formation of the Alleged Agreement

In its first issue, White Oak argues that the evidence is legally and factually insufficient to support the jury's determination in response to Question 7 that the preponderance of the evidence does not support a finding that Stallion and White Oak entered into the Alleged Agreement on May 23, 2007.[1]   In this question, the trial court instructed the jury that "to form a valid agreement the parties must have the same understanding of the subject matter of the contract and all essential terms." At the charge conference, no party objected to this instruction; therefore, we measure the sufficiency of the evidence using this instruction, even if it does not correctly state the law.  *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (holding that appellate court could not review the sufficiency of the evidence based on a particular legal standard because that standard was not submitted to the jury and no party objected to the charge on this ground or requested that the jury be charged using this standard); *Hirschfeld Steel Co. v. Kellogg Brown & Root, Inc.*, 201 S.W.3d 272, 283–86 (Tex. App.—Houston [14th Dist.] 2006, no. pet.) (reviewing sufficiency of evidence based on unobjected-to jury instruction and rejecting various arguments based on different legal standards).

In this regard, Joe Lauer of White Oak testified at trial that his understanding of the terms to which Stallion and White Oak agreed on May 23, 2007 was that Stallion "would take responsibility for damage and cost for the incident."   Mike Rayburn of White Oak testified at trial that his understanding of the agreement between Stallion and White Oak on May 23, 2007 was as follows: Stallion promised to pay White Oak for all costs incurred

---

[1]  Under the first issue, White Oak also asserts that the trial court erred in submitting an uncontested legal issue to the jury in Question 7.   White Oak did not voice this complaint during the charge conference and did not challenge Question 7 as being immaterial in its post-trial motions under Texas Rule of Civil Procedure 301.   Therefore, White Oak failed to preserve error regarding this complaint.   *See* Tex. R. App. P. 33.1; *In re B.L.D.*, 113 S.W.3d 340, 349–54 (Tex. 2003) (stating that party waived charge error alleged on appeal by failing to timely assert this objection to the charge in the trial court); *In re A.V.*, 113 S.W.3d 355, 358 (Tex. 2003) (same as *B.L.D.*).   However, in one of its motions for judgment notwithstanding the verdict, White Oak preserved error regarding its argument that the evidence is legally insufficient to support the jury's finding in response to Question 7.

and damage sustained as a result of the blowout, and in exchange, White Oak promised to (1) forebear any claims it had against Stallion with respect to the blowout, (2) allow Stallion to use its own equipment and personnel to minimize the cost to Stallion of controlling the Well, repairing the damage, and containing and cleaning up the pollution and contamination, and (3) keep Stallion on its approved vendor list so that Stallion could continue to do business with White Oak. Rayburn testified that Angelle and Lauer entered into this agreement on May 23, 2007, and that Rayburn approved it. According to Rayburn, under the Alleged Agreement, Stallion promised to pay all damages associated with the blowout, including damages resulting from downhole injury to the Well allegedly caused by the blowout.

Angelle gave conflicting testimony at trial regarding the Alleged Agreement. Angelle testified in pertinent part as follows:

- On May 23, 2007, there was no deal made that White Oak would use Stallion for future work.

- Angelle did not assure Lauer that Stallion would take responsibility for damage and cost for the incident.

- At his deposition, Angelle stated that he assured Lauer that Stallion would take responsibility for damage and cost for the incident, and Angelle was not testifying to something different at trial.

- In trying to explain why he stated at trial that he did not assure Lauer that Stallion would take responsibility for damage and cost for the incident, Angelle stated: "The damage, yes, we knew we had damage there that we were going to take care of; but the question you asked me was that we were going to take care of all cost. I don't have control over all cost, and we didn't know what the damage was for all cost and damages."

- In May 2007, Angelle did not know that a master service agreement existed between White Oak and Stallion.

- In May 2007, Angelle did know that the Master Agreement existed, but he did not know what the contents of the Master Agreement were.

8

- Despite knowing that the Master Agreement existed, Angelle agreed that Stallion would take responsibility for damage and cost for the incident and would pay White Oak for (1) third-party costs to control the Well, (2) costs to clean up pollution, and (3) costs to repair damage to the wellhead. But Angelle did not agree to pay for downhole damage.

- "[W]e were going to manage what we could do ourself. And there was no — agreement on anything past that."

Based upon the trial testimony, the jury reasonably could have found that White Oak understood the essential terms of the purported May 23, 2007 agreement to include (1) a promise by Stallion to pay White Oak for any downhole damage caused by the blowout, and (2) a promise by White Oak to keep Stallion on White Oak's approved vendor list so that Stallion could continue to do business with White Oak. The jury also reasonably could have determined that Stallion understood that neither of the foregoing terms were included in the essential terms of the purported May 23, 2007 agreement.

Considering the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that the trial evidence would enable reasonable and fair-minded people to find that (1) Stallion and White Oak did not have the same understanding of the subject matter of the Alleged Agreement and all its essential terms, and (2) the preponderance of the evidence does not support a finding that Stallion and White Oak entered into the Alleged Agreement on May 23, 2007. *See City of Keller,* 168 S.W.3d at 823, 827; *Aldridge v. Avara*, No. 14-05-01283-CV, 2007 WL 2366964, at *2–3 (Tex. App.—Houston [14th Dist.] Aug. 21, 2007, no pet.) (concluding evidence was legally sufficient to support finding that parties did not enter into agreement) (mem. op.). Examining the entire record, considering both the evidence in favor of, and contrary to, the challenged finding, and considering and weighing all the evidence, we conclude that the jury's answer to Question 7 is not so contrary to the overwhelming weight of the evidence

9

as to be clearly wrong and unjust.[2]  *See Pool*, 715 S.W.2d at 635; *Aldridge*, 2007 WL 2366964, at *4–6 (concluding evidence was factually sufficient to support finding that parties did not enter into agreement).  Accordingly, we overrule White Oak's first issue.[3]

## B.      White Oak's Alleged Breach of the Master Agreement

Under its second issue, White Oak argues that the evidence is legally insufficient to support the jury's finding in response to Question 1 and that the evidence conclusively establishes that Stallion orally agreed to perform its Post-Blowout Services free of charge.[4] In Question 1, the trial court simply asked the jury, "[d]id White Oak fail to comply with the [Master Agreement] by failing to pay Stallion's invoice?"  The jury answered "yes." The trial court did not find that the Master Agreement was ambiguous or instruct the jury to determine the mutual intent of the parties as to any portion of the Master Agreement.  In construing contracts, our primary concern is to ascertain and give effect to the intentions of the parties as expressed in the contract.  *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998).  To ascertain the parties' true intentions, we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless.  *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999).  Whether a contract is ambiguous is a question of law for the court.  *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably

---

[2]  Stallion asserts that White Oak failed to preserve error in the trial court regarding this factual-sufficiency challenge.   White Oak argues that it did preserve error.   We presume, for the sake of argument, that White Oak adequately preserved this complaint.   Even so, we conclude that this complaint lacks merit.

[3]  Under the first issue, White Oak also asserts that the trial court erred in submitting to the jury Question 8, regarding failure to comply with the Alleged Agreement.   White Oak did not voice this complaint during the charge conference and did not challenge Question 8 as being immaterial in its post-trial motions under Texas Rule of Civil Procedure 301.   Therefore, White Oak failed to preserve error regarding this complaint.  *See* Tex. R. App. P. 33.1; *In re B.L.D.*, 113 S.W.3d at 349–54; *In re A.V.*, 113 S.W.3d at 358. In addition, the jury did not answer this question, and this court has found no merit in White Oak's challenges to the jury's finding in answer to Question 7.   Consequently, any error in submitting Question 8 would be harmless.

[4]  The trial court denied White Oak's motion for directed verdict and motion for judgment notwithstanding the verdict in which White Oak raised these issues.

susceptible to more than one interpretation. *Id.* But, when a written contract is worded so that it can be given a certain or definite legal meaning or interpretation, it is unambiguous, and the court construes it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). We cannot rewrite the Master Agreement or add to its language under the guise of interpretation. *See id.* at 162. Rather, we must enforce the Master Agreement as written. *See Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex. 1965).

In pertinent part, the Master Agreement provides as follows:

- The Master Agreement "shall control and govern all work performed or to be performed by [Stallion] under verbal or written work orders, purchase orders, delivery tickets, invoices or other verbal or written agreements between the parties, relating to work to be done by [Stallion] for [White Oak]. . . ."

- Under section 8 of the Master Agreement, "[White Oak] shall be liable for the cost of regaining control of any wild well, as well as for cost of removal of debris, and [White Oak] shall release [Stallion] from, and [White Oak] shall indemnify [Stallion] against, any liability for such cost."

- Under section 8 of the Master Agreement, notwithstanding anything to the contrary in the Master Agreement, White Oak "shall assume all responsibility for, including control and removal of, and protect, defend, indemnify and save [Stallion] harmless from and against all claims, demands and causes of action of every kind and character arising directly or indirectly from all . . . pollution or contamination which may occur during the conduct of operations hereunder [other than certain pollution or contamination not relevant in the case under review], including, but not limited to, that which may result from . . . blowout . . . or any other uncontrolled flow of oil, gas, water or other substance." Under section 8(g) of the Master Agreement, this assumption of responsibility and indemnity is made regardless of whether Stallion caused the loss or was negligent.

- Under section 10 of the Master Agreement, "[t]he consideration to be paid by [White Oak] to [Stallion] as a result of any agreement between the parties shall be the amount set forth and agreed to in any verbal or written work order, purchase order, delivery ticket, invoice or other agreement hereafter entered into between the parties, and shall be in the amount set forth in the rate schedule furnished [White Oak] prior to the commencement of the work

11

or, if no schedule be furnished, the amount shown in the applicable work order or purchase order of [White Oak]; provided, however, that the amount to be paid for any service or labor or material furnished or sued in connection with such work shall not exceed [Stallion's] usual and customary charge for such services, labor or material to the locality where the work is to be performed."

We conclude that the relevant provisions of the Master Agreement are unambiguous, and any parol evidence contrary to the unambiguous meaning of the Master Agreement is incompetent to change this meaning. *See Clear Lake City Water Auth. v. Friendswood Dev. Co., Ltd.*, 256 S.W.3d 735, 752 n. 23 (Tex. App.—Houston [14th Dist.] 2008, pet. dism'd) (stating that unobjected-to parol evidence is incompetent and has no probative value).

Under the unambiguous language of the Master Agreement, the only work governed by this agreement is work performed or to be performed by Stallion under an oral or written agreement between White Oak and Stallion. Under Section 10 of the Master Agreement, the compensation to be paid Stallion for work performed under the Master Agreement is the amount to which Stallion and White Oak agreed in their oral or written agreement that triggers the application of the Master Agreement. The Master Agreement states that if Stallion gives White Oak a rate schedule before beginning its work, then the amount of compensation shall be the amount set forth in the rate schedule. In addition, under the Master Agreement, the parties agreed that the amount to be paid Stallion shall not exceed Stallion's usual and customary charge for such services, labor or material in the locality where the work is to be performed. For various business reasons, companies sometimes may decide that it is in their interests to perform certain services or to provide certain goods free of charge. Nothing in the Master Agreement prevents Stallion and White Oak from agreeing that the amount of compensation to be received by Stallion for providing certain goods and services will be zero—that these goods and services will be provided free of charge.

Under section 8 of the Master Agreement, regardless of whether Stallion caused the loss or was negligent, White Oak agreed to indemnify Stallion against any liability for (1)

12

the cost of regaining control of any wild well, (2) the cost of removal of debris left by any wild well, and (3) all claims arising directly or indirectly from all pollution or contamination which may occur during the conduct of operations under the Master Agreement (other than certain pollution or contamination not relevant in the case under review), including, but not limited to, that which may result from a blowout. Under section 8, White Oak also agreed that it would be liable for the costs of regaining control of any wild well and for the costs of removing debris left by any wild well.

No evidence at trial showed that Stallion gave White Oak a rate schedule before beginning its work in response to the blowout of the Well. Mike Rayburn testified that the Post-Blowout Services were subject to the Master Agreement and that Stallion and White Oak agreed Stallion would provide the Post-Blowout Services free of charge. In Angelle's testimony, he stated that he agreed Stallion would provide the Post-Blowout Services at no cost to White Oak. Angelle stated that he had no idea why Stallion was suing White Oak seeking payment for these services. Angelle also stated that White Oak always solicited bids on its jobs. There was no evidence that White Oak solicited any bids for the Post-Blowout Services.

Lauer testified that Angelle asked him if Stallion could provide the Post-Blowout Services at no cost to White Oak. Lauer stated that he did not have authority to agree to such an arrangement, but Lauer called White Oak's office and obtained this authority. According to Lauer, Stallion and White Oak agreed that Stallion would provide the Post-Blowout Services at no cost to White Oak. Lauer stated that he did not agree that White Oak would pay Stallion for these services. That Stallion agreed to provide the Post-Blowout Services free of charge is also suggested by the evidence that, though these services had been completely rendered by August 1, 2007, Stallion did not send White Oak the Invoice requesting payment for these services until May 12, 2008, almost a year after the blowout and more than seven months after Stallion filed suit against White Oak. The Invoice does not contain any contractual terms or conditions, and it does not purport to be an agreement between Stallion and White Oak. After White Oak received the Invoice

from Stallion in May 2008, Rayburn sent a letter to Stallion stating that Stallion had agreed to perform the Post-Blowout Services at no charge to White Oak.

Angelle, Rayburn, and Lauer all testified that Stallion and White Oak entered into an oral agreement that Stallion would provide the Post-Blowout Services free of charge. But based upon the jury's answer to Question 1, we presume that the jury chose not to credit any of this testimony. *See Kormanik v. Seghers*, —S.W.3d—,—, 2011 WL 2322369, at *7 (Tex. App.—Houston [14th Dist.] June 14, 2011, no pet. h.). As factfinder, the jury had the prerogative to disbelieve the testimony that Stallion and White Oak entered into an oral agreement that Stallion would provide the Post-Blowout Services free of charge. *See id*; *Duruji v. Duruji*, No. 14-05-01185-CV, 2007 WL 582282, at *5 (Tex. App.—Houston [14th Dist.] Feb. 27, 2007, no pet.) (mem. op.). We conclude that the evidence is legally and factually sufficient to support the jury's implied finding that Stallion and White Oak did not enter into an agreement that Stallion would provide the Post-Blowout Services free of charge.[5] *See City of Keller,* 168 S.W.3d at 823, 827; *Pool*, 715 S.W.2d at 635; *Aldridge*, 2007 WL 2366964, at *4–6 (concluding evidence was legally and factually sufficient to support finding that parties did not enter into agreement).

We presume for the sake of argument that, as argued by White Oak, absent this testimony, there is no evidence that the Post-Blowout Services constituted work performed or to be performed by Stallion under an oral or written agreement between White Oak and Stallion. If so, then there would be no evidence that White Oak breached section 10 of the Master Agreement by failing to pay the Invoice. This raises the issue of whether a breach by White Oak of its obligations under section 8 of the Master Agreement could support the jury's finding in answer to Question 1. In Question 1, the trial court did not limit the inquiry to any particular part of the Master Agreement. But, in Questions 4 through 6, the trial court asked the jury whether White Oak breached the Master Agreement by failing to

---

[5] As stated in Section III.A., above, we conclude that, in Question 7, the trial court asked the jury to decide only whether the parties entered into the Alleged Agreement on May 23, 2007. To the extent Question 7 could be construed to ask the jury whether the parties entered into an agreement that Stallion would provide the Post-Blowout Services free of charge, the evidence is legally and factually sufficient to support the jury's finding in this regard, as explained in this Section III.B.

indemnify Stallion. We presume for the purposes of this analysis that, because the trial court submitted White Oak's potential indemnity liability in Questions 4 through 6, the trial court did not submit White Oak's potential indemnity liability in Questions 1 through 3. Nonetheless, under section 8(d) of the Master Agreement, White Oak is "liable for the cost of regaining control of any wild well, as well as for cost of removal of debris." Under the plain meaning of this language, White Oak agreed to pay Stallion for the cost of regaining control of any wild well and for cost of removal of debris left by a wild well. We conclude that this liability is not part of White Oak's duty to indemnify Stallion under other language in section 8. Therefore, even if the trial court did not submit White Oak's potential indemnity liability in Question 1, we conclude that the trial court did submit White Oak's potential liability for these costs relating to a wild well.

White Oak agrees and the evidence shows that the permatizing work that Stallion was performing when the blowout and wild well occurred was performed under the Master Agreement. At trial Rayburn testified that the Well was a wild well on May 23, 2007. Rayburn also described Stallion's Post-Blowout Services as "[Stallion] basically helped get the results of the blowout under control, not the actual blowout itself, but the resulting mess that was caused." Based upon this testimony and the description of Stallion's services in the Invoice, the jury reasonably could have found that the cost of the Post-Blowout Services was a cost of either regaining control of a wild well or of removing debris left by a wild well and that White Oak's failure to pay the Invoice was a failure to comply with White Oak's duty under the Master Agreement to pay such costs. Considering the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that the trial evidence would enable reasonable and fair-minded people to find that (1) Stallion and White Oak did not enter into an agreement that Stallion would provide the Post-Blowout Services free of charge; (2) the cost of the Post-Blowout Services was a cost of either regaining control of a wild well or of removing debris left by a wild well; (3)

15

White Oak's failure to pay the Invoice was a failure to comply with its duty under the Master Agreement to pay such costs; and (4) White Oak failed to comply with the Master Agreement by failing to pay the Invoice.[6]  *See City of Keller,* 168 S.W.3d at 823, 827; *Aldridge*, 2007 WL 2366964, at \*2–3.   Examining the entire record, considering both the evidence in favor of, and contrary to, the challenged finding, and considering and weighing all the evidence, we conclude that the jury's answer to Question 1 is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.[7]  *See Pool*, 715 S.W.2d at 635; *Aldridge*, 2007 WL 2366964, at \*4–6.   Accordingly, we overrule White Oak's second issue.[8]

## C.  White Oak's Challenge to Stallion's Attorney's Fees Recovery

In its third issue, White Oak asserts that, if this court sustains White Oak's first or second issue, then the jury's answers to Questions 1 through 3 must be disregarded and there is no basis upon which Stallion may recover attorney's fees.   Even if the foregoing argument were correct, this court has overruled White Oak's first and second issues, and therefore, we overrule White Oak's third issue.

---

[6] In Question 3, the trial court asked the jury to find the amount of Stallion's damages that resulted from the failure to comply that the jury found in answer to Question 1.   The amount of the Invoice was undisputed. Therefore, the trial court would not have submitted Question 3 if a duty to pay the entire Invoice were required to find a breach of the Master Agreement under Question 1.   Thus, even if the evidence were insufficient to support a finding that all of the costs in the Invoice were costs of either regaining control of a wild well or of removing debris left by a wild well, the evidence still would be legally and factually sufficient to support a finding that some of the costs in the Invoice fall within this category.   White Oak's failure to pay the part of the Invoice covering such costs and White Oak's duty to pay such costs under the Master Agreement would be a sufficient basis upon which to conclude that legally and factually sufficient evidence supports the jury's answer to Question 1.

[7] Stallion asserts that White Oak failed to preserve error in the trial court regarding this factual-sufficiency challenge.   White Oak argues that it did preserve error.   We presume, for the sake of argument, that White Oak adequately preserved this complaint.   Nonetheless, we conclude that this complaint lacks merit.

[8] Under the second issue, White Oak also asserts that because the trial court erred in submitting Question 1 to the jury, it also was error to submit Questions 2 and 3 to the jury.   Presuming for the sake of argument that White Oak preserved error in this regard, the complaint lacks merit because the trial court did not err in submitting Question 1 to the jury.   In addition, White Oak asserts that the trial court should have disregarded the jury's answers to Questions 2 and 3 because the evidence is legally and factually insufficient to support the jury's answer to Question 1.   But we have rejected this challenge to the jury's answer to Question 1 for the reasons stated above.

## D.    The Jury's Failure to Find that Stallion Committed Fraud

In its fourth issue, White Oak argues that the evidence is legally and factually insufficient to support the jury's failure to find, in response to Question 16, that Stallion committed common-law fraud.  White Oak argues that the evidence establishes as a matter of law that Stallion falsely promised to pay White Oak for the costs and expenses of the blowout, even though Stallion had no intention of paying unless Stallion's insurance covered the loss.[9]  White Oak asserts that, on May 23, 2007, Angelle, acting on behalf of Stallion, promised White Oak that Stallion would pay White Oak for costs and damages resulting from the blowout.  White Oak does not argue that the evidence conclusively proves (1) Stallion made a false statement of fact or (2) Angelle had an intent not to perform as promised when he made this promise.[10]  Instead, White Oak relies upon the testimony of Johnson, Stallion's Chief Executive Officer.  Johnson testified that, from the beginning, Stallion had no intention of ever paying White Oak unless Stallion's insurance funded the payment.  Johnson also testified that the requirement that Stallion's insurance would fund any payment was not communicated to White Oak until after May 23, 2007.  White Oak asserts that, because no witness contradicted Johnson's testimony in this regard, the evidence conclusively proves that, when Angelle allegedly promised to pay White Oak for the costs and expenses of the blowout on May 23, 2007, Stallion had an intent not to perform as promised.  But, as factfinder, the jury had the prerogative to disbelieve this part of Johnson's testimony.  *See Kormanik*, 2011 WL 2322369, at \*7; *Duruji*, 2007 WL 582282, at \*5.  Angelle did not testify that any promise he made was contingent upon Stallion's insurance funding the payment.  Other than Johnson's testimony, there is no evidence showing that when Angelle allegedly promised to pay White Oak for the costs and expenses of the blowout on May 23, 2007, Stallion had an

---

[9]   White Oak has not cited any case in which a court has held that the evidence proved common-law fraud as a matter of law.   Research reveals no such Texas case.

[10]  If White Oak had made these arguments, they would lack merit.

17

intent not to perform such a promise.

Under Question 16, to find that Stallion committed fraud, the jury had to find, among other things, that Stallion either (1) made a false statement of fact, or (2) made a promise of future performance with the intent, at the time the promise was made, not to perform as promised. Considering the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, the trial evidence would enable reasonable and fair-minded people to determine that the preponderance of the evidence does not support a finding that Stallion made such a statement or such a promise. *See City of Keller,* 168 S.W.3d at 823, 827; *O'Connor v. Miller*, 127 S.W.3d 249, 258–59 (Tex. App.—Waco 2003, pet. denied) (concluding evidence was legally sufficient to support jury's failure to find common-law fraud); *Trinity Indus., Inc. v. Ashland, Inc.*, 53 S.W.3d 852, 867 (Tex. App.—Austin 2001, pet. denied) (same as *O'Connor*). Therefore, the evidence is legally sufficient to support the jury's failure to find that Stallion committed fraud against White Oak. Examining the entire record, considering both the evidence in favor of, and contrary to, the challenged finding, and considering and weighing all the evidence, we conclude that the jury's answer to Question 16 is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.[11] *See Pool*, 715 S.W.2d at 635; *O'Connor*, 127 S.W.3d at 258–59 (concluding evidence was factually sufficient to support jury's failure to find common-law fraud). The evidence is factually sufficient to support this answer. Accordingly, we overrule White Oak's fourth issue.

## E. The Jury's Failure to Find that Stallion's Bulldozer Hit the Wellhead

In its fifth issue, White Oak argues that the evidence is legally and factually insufficient to support the jury's failure to find, in response to Question 11, that Stallion

---

[11] Stallion asserts that White Oak failed to preserve error in the trial court regarding this factual-sufficiency challenge. White Oak argues that it did preserve error. We presume, for the sake of argument, that White Oak adequately preserved this complaint. Even so, we conclude that this complaint lacks merit.

18

breached its duty to perform the permatizing work with due diligence and in a good and workmanlike manner. White Oak argues that the evidence establishes as a matter of law that while performing permatizing work Duhon (Stallion's bulldozer operator) hit the wellhead of the Well, causing the blowout. Though Duhon's testimony was conflicting, Duhon testified that he was certain that he did not hit the wellhead of the Well on May 23, 2007. Duhon stated that he was using a very small bulldozer, traveling at a slow speed. Powell (Stallion's safety director) testified that, after the incident, he examined the blade of the tractor looking for scratches or paint, that he did not observe any paint on the blade or any damage to the blade, and that he later looked at the wellhead and did not see any place where there was an impact. Stallion's expert witness, Don Remson, testified that he had not seen any objective evidence that Duhon's bulldozer struck the wellhead on the Well. Remson also testified that, based upon the force necessary to damage the wellhead and cause a blowout and the lack of marks on the bulldozer and the Christmas tree, Remson did not believe that Duhon could have caused the blowout.

Considering the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that the trial evidence would enable reasonable and fair-minded people to determine that the preponderance of the evidence does not support a finding that (1) Duhon's bulldozer hit the wellhead of the Well; (2) Duhon's performance of the permatizing work caused the blowout of the Well; and (3) Stallion breached its duty to perform the permatizing work with due diligence and in a good and workmanlike manner. *See City of Keller,* 168 S.W.3d at 823, 827. Examining the entire record, considering both the evidence in favor of, and contrary to, the challenged finding, and considering and weighing all the evidence, we conclude that the jury's answer to Question 11 is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.[12] *See Pool,* 715 S.W.2d at 635. Accordingly, we overrule White Oak's fifth issue.

---

[12] Stallion asserts that White Oak failed to preserve error in the trial court regarding this factual-sufficiency

## IV. CONCLUSION

The evidence is legally and factually sufficient to support the jury's finding that White Oak failed to comply with the Master Agreement by not paying the Invoice. The evidence is also legally and factually sufficient to support the jury's determination that the preponderance of the evidence does not support a finding that (1) Stallion and White Oak entered into the Alleged Agreement on May 23, 2007; (2) Stallion committed fraud against White Oak, and (3) Stallion failed to perform the permatizing work with due diligence and in a good and workmanlike manner to completion in accordance with the Master Agreement.

The trial court's judgment is affirmed.


/s/      Kem Thompson Frost
          Justice


Panel consists of Justices Anderson, Frost, and Boyce.

---

challenge. White Oak disputes this assertion. Presuming for the sake of argument that White Oak adequately preserved this complaint, we find no merit in it.