**Affirmed in Part and Reversed and Rendered in Part, and Majority and Concurring Opinions filed August 31, 2021.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-19-00204-CV

---

## CCC GROUP, INC., Appellant

## V.

## ENDURO COMPOSITES, INC. AND J.P. MACK INDUSTRIES, LLC, Appellees

---

**On Appeal from the 190th District Court
Harris County, Texas
Trial Court Cause No. 2014-18092**

---

# MAJORITY OPINION

A general contractor appeals the trial court's money judgment against the general contractor and in favor of a subcontractor and its supplier based on a jury verdict in favor of the subcontractor on its claim for breach of the subcontract and in favor of the supplier on its claim for breach of a joint check agreement between the general contractor, the subcontractor, and the supplier. Concluding that the trial evidence is legally insufficient to support the jury's findings that the general

contractor failed to comply with the joint check agreement and that the general contractor committed fraud against the supplier, we reverse the parts of the trial court's judgment addressing the supplier's claims against the general contractor and render judgment that the supplier take nothing against the general contractor. Concluding that the general contractor has not shown error in the parts of the judgment in which the trial court rendered judgment in favor of the subcontractor, we affirm the remainder of the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mosaic Fertilizer, LLC, the owner of a facility in St. James, Louisiana, hired appellant/defendant CCC Group, Inc. as the general contractor for the construction of improvements to the facility (the "Project"). CCC Group entered into a subcontract with appellee/defendant J.P. Mack Industries, LLC to provide labor, equipment, and materials for the Project, including the installation of siding on various structures (the "Subcontract"). Under the Subcontract J.P. Mack agreed to "furnish and pay for any and all labor, supervision, materials, tools, construction equipment, supplies and/or other facilities and services necessary for the proper execution and completion of [J.P. Mack's] Work as set forth in the WORK RELEASE,[1] and as more fully described in and/or reasonably inferable from all the Contract Documents." J.P. Mack began working on Work Release 1 in December 2011. CCC Group issued eleven work releases to J.P. Mack through May 2012.

---

[1] All capitals in the original.

After J.P. Mack had problems with its first siding supplier, Resolite, J.P. Mack obtained approval to use appellee/plaintiff Enduro Composites, Inc. as the siding supplier. Enduro began supplying siding to J.P. Mack for use on the Project. After J.P. Mack asked Enduro for a credit increase, Enduro determined that J.P. Mack did not meet Enduro's standards for a credit increase. At the end of February 2012, CCC Group, J.P. Mack, and Enduro each signed a one-page Joint Check Agreement ("Joint Check Agreement"). Based on the execution of the Joint Check Agreement, Enduro increased J.P. Mack's credit line.



In the Joint Check Agreement, CCC Group agreed to issue checks made jointly payable to J.P. Mack and Enduro in accordance with monthly progress payments to J.P. Mack under the Subcontract, but only for materials, services, labor or equipment ("Goods or Services") supplied to the Project by Enduro "for which [CCC Group] has been provided with complete invoices, delivery tickets, and such other documentation as may be reasonably requested by [CCC Group] establishing and evidencing the debt of [J.P. Mack] to [Enduro]."

Both before and after execution of the Joint Check Agreement, Enduro sent invoices to J.P. Mack, but Enduro did not send these invoices to CCC Group. J.P. Mack did not send CCC Group the invoices that Enduro sent J.P. Mack for the siding Enduro supplied. J.P. Mack sent invoices to CCC Group under the Subcontract, but none of these invoices mentioned Enduro or stated an amount attributable to siding. J.P. Mack's invoices to CCC Group instructed CCC Group to make payment to J.P. Mack. CCC Group did not issue any check jointly payable to J.P. Mack and Enduro. J.P. Mack did not make a payment on any of the invoices that Enduro sent J.P. Mack after execution of the Joint Check Agreement. Joe

Garza, CCC Group's general counsel and corporate secretary, testified at trial that the first time he learned that J.P. Mack owed Enduro money for siding provided for the Project was around the September 2012 time frame.

J.P. Mack did not send an invoice to CCC Group in June, July, August, or September 2012. CCC Group received its final payment from Mosaic before August 6, 2012. On that date, a representative of CCC Group executed a "Contractor's Affidavit and Final Waiver of Lien," in which the representative stated that CCC Group had been paid in full with respect to its work under its contract with Mosaic Fertilizer, LLC. CCC Group's representative also certified under oath as follows:

> that "bills, payrolls, expenses, costs, taxes, claims and other indebtedness incurred in connection with the work performed under [CCC Group's contract with Mosaic] have been paid in full; and [that the representative] further covenants and agrees to indemnify, defend, and hold harmless [Mosaic] from and against claims, damages and expenses, including liens, of subcontractors, laborers, and equipment and material suppliers arising out of, resulting from, or in any way connected with the work performed under [CCC Group's contract with Mosaic]."

Timothy Broussard, Enduro's Chief Executive Officer, testified at trial that before August 6, 2012, no person from CCC Group contacted him about whether Enduro had been paid. J.P. Mack contends that no CCC Group representative approached J.P. Mack regarding any remaining invoices before a representative of CCC Group executed the affidavit and final waiver of lien.

After not invoicing CCC Group for four months, in October 2012, J.P. Mack sent an invoice to CCC Group seeking payment for: (1) amounts allegedly remaining due on Work Releases 1, 7, 8, and 11 totaling $81,745.10; (2) "Additional Siding on C-Train for Asbestos Removal" in the amount of $168,920.42; (3) "Overtime not included in the contract" in the amount of

4

$266,220.00; and (4) "Equipment not included in the contract" in the amount of $122,707.97.

Enduro filed suit in the trial court asserting various claims, including claims for breach of the Joint Check Agreement and for fraud against CCC Group, and for breach of contract against J.P. Mack. J.P. Mack filed a cross-claim against CCC Group for breach of the Subcontract. Trial testimony from Enduro's Chief Executive Officer indicated that Enduro did not follow the procedures necessary to obtain a lien on Mosaic's property based on the failure to pay Enduro for all of the materials Enduro supplied to the Project.

The case was tried to a jury, and the jury found that (1) CCC Group failed to comply with the Joint Check Agreement; (2) CCC Group materially failed to comply with the Subcontract; (3) a preponderance of the trial evidence did not prove that CCC Group's failure to comply with the Subcontract was excused due to waiver; (4) J.P. Mack materially failed to comply with the Subcontract; (5) CCC Group committed fraud against Enduro; (6) $288,352.10 would fairly and reasonably compensate Enduro for its damages that resulted from CCC Group's failure to comply with the Joint Check Agreement; (7) $300,000 would fairly and reasonably compensate J.P. Mack for its damages that resulted from CCC Group's failure to comply with the Subcontract; (8) a preponderance of the trial evidence did not prove that any damage to CCC Group resulted from J.P. Mack's failure to comply with the Subcontract; (9) $100,000 would fairly and reasonably compensate Enduro for its damages that resulted from CCC Group's fraud; and (10) clear and convincing evidence did not prove that the harm to Enduro resulted from fraud.

The trial court rendered judgment that (1) Enduro recover from CCC Group and J.P. Mack, jointly and severally, the sum of $288,352.10, plus prejudgment

interest of about $73,500, and attorney's fees of $127,155.62; and (2) J.P. Mack recover from CCC Group the sum of $300,000, plus prejudgment interest of $85,200, and attorney's fees of $49,900.

## II. ISSUES AND ANALYSIS[2]

### A. Is the evidence legally insufficient to support the jury's answer to Question 1?

Liberally construing CCC Group's briefing, CCC Group argues under its first issue that (1) the Joint Check Agreement's requirement that CCC Group be provided with "complete invoices and delivery tickets" is a condition precedent to any obligation under the agreement that CCC Group issue a joint check; and (2) the trial evidence is legally insufficient to show that this condition precedent occurred, so the evidence is legally insufficient to support the jury's answer to Question 1. CCC Group preserved error on this argument in the trial court by objecting to Question 1. CCC Group also obtained an adverse ruling on its motion for judgment notwithstanding the verdict.

In Question 1, the trial court asked the jury "Did CCC Group, Inc. fail to comply with the Joint Check Agreement?" The trial court did not give the jury any specific instructions regarding Question 1. The jury answered "yes." When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* The factfinder is the only judge

---

[2] Justice Spain joins Section II. A. of this Majority Opinion, so Section II. A is unanimous.

of witness credibility and the weight to give to testimony. *See id.* at 819.

## 1. *Is the provision of complete invoices to CCC Group a condition precedent?*

CCC Group asserts that the provision of "complete invoices" and "delivery tickets" to CCC Group is a condition precedent to any obligation of CCC Group to issue a joint check under the Joint Check Agreement. Enduro argues that the provision of complete invoices is at most a covenant, rather than a condition precedent. Under the one-page Joint Check Agreement, CCC Group, J.P. Mack, and Enduro agreed that CCC Group would issue joint checks under specific circumstances:

> [CCC Group] shall issue checks made jointly payable to [J.P. Mack] and [Enduro] in accordance with monthly progress payments to [J.P. Mack] under the Subcontract, **but only for** materials, services, labor and/or equipment supplied to the Project by [Enduro]: (i) that were ordered by [J.P. Mack] pursuant to the above Subcontract; (ii) that comply with the Subcontract documents; (iii) that are incorporated into the project; and (iv) **for which [CCC Group] has been provided with complete invoices, delivery tickets, and such other documentation as may be reasonably requested by [CCC Group] establishing and evidencing the debt of [J.P. Mack] to [Enduro]**.

(emphasis added). The parties agreed that "All joint check monies shall be applied to labor, services, materials, and/or equipment pertaining to the Project and in no way shall create a liability on [CCC Group's] part for sums owed [Enduro] by [J.P. Mack]." In paragraph 5 of the Joint Check Agreement, the parties also agreed that the agreement would "in no event create an obligation upon [CCC Group] to make payments in excess of the amounts due [J.P. Mack] under the Subcontract."

In construing contracts, our primary concern is to ascertain and give effect to the intentions of the parties as expressed in the contract. *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). To ascertain the parties' true intentions, we examine the entire agreement in an effort to harmonize and give

7

effect to all provisions of the contract so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co*., 995 S.W.2d 647, 652 (Tex. 1999). Whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Id*. However, when a written contract is worded so that it can be given a certain or definite legal meaning or interpretation, it is unambiguous, and the court construes it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

Timothy Broussard, Enduro's Chief Executive Officer, testified at trial that Enduro asked for a joint check agreement because (1) J.P. Mack requested a credit increase; (2) J.P. Mack did not meet Enduro's standards for approval of the credit increase; and (3) Enduro "needed some form of guaranty from another party to back [J.P. Mack's] credit." According to Broussard, by signing the Joint Check Agreement, CCC Group "basically back[ed] the credit of [J.P. Mack]." According to Broussard, Enduro approved J.P. Mack's request for a credit increase based on the execution of the Joint Check Agreement.

To the extent Broussard thought that in the Joint Check Agreement CCC Group guaranteed any debt owed by J.P. Mack to Enduro, Broussard was mistaken. The parties to the Joint Check Agreement agreed that "all joint check monies . . . in no way shall create a liability on [CCC Group's] part for sums owed [Enduro] by [J.P. Mack]." Under the plain text of the agreement, CCC Group has an obligation to issue checks made jointly payable to J.P. Mack and Enduro in accordance with monthly progress payments to J.P. Mack under the Subcontract, but CCC Group has this obligation only for Goods or Services supplied to the Project by Enduro: (i) that J.P. Mack ordered pursuant to the Subcontract; (ii) that comply with the

8

Subcontract documents; (iii) that are incorporated into the Project; and (iv) for which CCC Group has been provided with complete invoices, delivery tickets, and such other documentation as may be reasonably requested by CCC Group establishing and evidencing the debt of J.P. Mack to Enduro. Under the Joint Check Agreement's unambiguous language, CCC Group agreed to issue checks made jointly payable to J.P. Mack and Enduro under certain circumstances; CCC Group did not guarantee any debt or payment by J.P. Mack to Enduro. *See Dealers Electrical Supp. Co. v. Scoggins Constr. Co., Inc.*, 292 S.W.3d 650, 659–60 (Tex. 2009).

When the parties executed the Joint Check Agreement, Enduro was supplying siding to J.P. Mack for use on the Project and invoicing J.P. Mack for the siding Enduro delivered. The parties could have agreed that any joint check that CCC Group was required to issue under the agreement would be based on the amount J.P. Mack charged CCC Group for the siding. Under the plain text of the Joint Check Agreement, CCC Group does not have an obligation to issue a check made jointly payable to J.P. Mack and Enduro for Goods or Services supplied to the Project by Enduro unless, among other things, CCC Group has been provided with complete invoices and delivery tickets for the Goods or Services, "and such other documentation as may be reasonably requested by CCC Group establishing and evidencing the debt of J.P. Mack to Enduro." If the joint check were to be based on an amount other than the amount Enduro charged J.P. Mack for the Goods or Services, for example, on the amount J.P. Mack charged CCC Group, there would be no need for CCC Group to request documents to establish and evidence the debt J.P. Mack owed Enduro. We conclude that under the Joint Check Agreement, any joint check that CCC Group might be obligated to issue for the Goods or Services would be based on the amount Enduro charged J.P. Mack for

9

the Goods or Services.

"A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992) (citations omitted). To determine whether the provision of complete invoices and delivery tickets is a condition precedent to any obligation on CCC Group to issue joint checks, we must ascertain the intention of the parties, and that can be done only by looking at the entire Joint Check Agreement. *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990); *Hirschfeld Steel Co., Inc. v. Kellogg Brown & Root, Inc.*, 201 S.W.3d 272, 281 (Tex. App.—Houston [14th Dist.] 2006, no pet.). To make performance specifically conditional, a term such as "if," "provided that," "on condition that," or some similar phrase of conditional language normally must be included. *See Criswell*, 792 S.W.2d at 948. If no such language is used, the terms typically will be construed as a covenant to prevent a forfeiture. *Id.* Though there is no requirement that such phrases be utilized, their absence is probative of the parties' intention that a promise be made, rather than a condition imposed. *Id.* The use or absence of such phrases is probative but not dispositive. *Martin Operating P'ship, LP v. QEP Marine Fuel Investment, LLC*, 525 S.W.3d 712, 726 (Tex. App.—Houston [14th Dist.] 2017, no pet.). In construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible. *See Criswell*, 792 S.W.2d at 948. When the intent of the parties is doubtful or when a condition would impose an absurd or impossible result, the agreement will be interpreted as creating a covenant rather than a condition. *Id.* Because of their harshness in operation, conditions are not favored in the law. *Id.*

Ascertaining the parties' intention by examining the entire Joint Check

Agreement, we note that the parties agreed that CCC Group had an obligation to issue checks made jointly payable to J.P. Mack and Enduro in accordance with monthly progress payments to J.P. Mack under the Subcontract, but the parties agreed that CCC Group had this obligation only for Goods or Services supplied to the Project by Enduro: (i) that J.P. Mack ordered pursuant to the Subcontract; (ii) that comply with the Subcontract documents; (iii) that are incorporated into the project; and (iv) for which CCC Group has been provided with complete invoices, delivery tickets, and such other documentation as may be reasonably requested by CCC Group establishing and evidencing the debt of J.P. Mack to Enduro. The parties did not use "if," "provided that," or "on condition that" in the Joint Check Agreement. Nonetheless, under the only reasonable construction of the "but only for" language, CCC Group had an obligation to issue checks jointly payable to J.P. Mack and Enduro only if (1) Enduro supplied Goods or Services; (2) J.P. Mack ordered the Goods or Services pursuant to the Subcontract; (3) the Goods or Services complied with the Subcontract documents; (4) the Goods or Services were incorporated into the Project; (5) CCC Group had been provided with complete invoices and delivery tickets for the Goods or Services; and (6) CCC Group had been provided with any other documentation as may have been reasonably requested by CCC Group establishing and evidencing the debt of J.P. Mack to Enduro for the Goods or Services.

It would not be reasonable to construe the language "but only for materials, services, labor and/or equipment . . . for which [CCC Group] has been provided with complete invoices [and] delivery tickets" as imposing on CCC Group an obligation to issue checks jointly payable to J.P. Mack and Enduro as to Goods or Services for which complete invoices and delivery tickets had not been provided to CCC Group. *See Martin Operating P'ship, LP*, 525 S.W.3d 726–27. As reflected

11

in the text of the Joint Check Agreement, the intent of the parties in this regard is not doubtful, and construing the provision of complete invoices and delivery tickets as a condition precedent would not impose an absurd or impossible result. Under the plain meaning of the language agreed to by the parties, if Enduro wanted CCC Group to be obligated to issue a joint check for Goods or Services Enduro supplied to the Project, Enduro had to, among other things, make sure that "complete invoices and delivery tickets" were provided to CCC Group for the Goods or Services. Doing so is not absurd or impossible. Though conditions precedent are not favored in the law, under the applicable legal standard, we conclude that the provision of complete invoices and delivery tickets to CCC Group for Goods or Services is a condition precedent to any obligation of CCC Group to issue a check jointly payable to J.P. Mack and Enduro for those Goods or Services. *See id.*

Enduro argues on appeal that the language "but only for materials, services, labor and/or equipment . . . for which [CCC Group] has been provided with complete invoices [and] delivery tickets" does not condition CCC Group's obligation to issue a joint check on a future event not certain to occur. Enduro relies on section 224 of the Restatement (Second) of Contracts. *See* Restatement (Second) of Contracts § 224 (1981) (stating that "[a] condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due"). Presuming for the sake of argument that a condition precedent must be based on a future event not certain to occur, the plain text of the Joint Check Agreement conditions CCC Group's obligation to issue a joint check on the provision of complete invoices and delivery tickets to CCC Group—a future event not certain to occur.

Enduro argues that CCC Group's obligation to issue a joint check cannot be

conditioned on CCC Group being provided with complete invoices and delivery tickets because of the first sentence of section 5.9 of the Subcontract, which CCC Group and J.P. Mack executed in the Fall of 2011. In this sentence, CCC Group and J.P. Mack agreed as follows:

> With respect to invoices sent to [CCC Group] by [J.P. Mack], [J.P. Mack] will upon request provide [CCC Group] with backup data of payments made to individual operatives and produce records to show operatives, transport companies and other relevant parties have been paid in a timely manner and in accordance with their payment terms.

Before the execution of the Joint Check Agreement, CCC Group and J.P. Mack agreed in this sentence that CCC Group had a right under the Subcontract to request and obtain from J.P. Mack backup data showing that relevant parties have been paid in a timely manner. This right under the Subcontract does not address the meaning of the language of the Joint Check Agreement. Nothing in this sentence in the Subcontract prevents the provision of complete invoices and delivery tickets to CCC Group from being a condition precedent to any obligation of CCC Group to issue a joint check under the Joint Check Agreement. The Joint Check Agreement does not state that CCC Group need only be provided with complete invoices and delivery tickets if CCC Group requests these documents. Instead, under the plain text of the agreement, CCC Group is obligated to issue checks jointly payable to J.P. Mack and Enduro only as to Goods or Services for which CCC Group has been provided with complete invoices and delivery tickets, without any requirement that CCC Group request or take steps to obtain the complete invoices or the delivery tickets. Enduro's argument based on this sentence in the Subcontract lacks merit.

Enduro suggests that the provision of complete invoices and delivery tickets to CCC Group cannot be a condition precedent to any obligation of CCC Group to

13

issue a joint check under the Joint Check Agreement because the Joint Check Agreement does not specify that any particular party must provide these documents to CCC Group. Enduro does not explain why the provision of certain documents to one contracting party may not be a condition precedent to a contracting party's obligation unless the agreement specifies who should provide the documents to the contracting party. Either Enduro or J.P. Mack could provide CCC Group with complete invoices and delivery tickets. The parties to the Joint Check Agreement were not required to specify the party providing the complete invoices and delivery tickets to CCC Group before the provision of these documents could be a condition precedent to CCC Group's obligation to issue a joint check under the agreement.

In support of its argument that the Joint Check Agreement contains no condition precedent, Enduro relies upon the First Court of Appeals's opinion in *Gulf Liquids New River Project, LLC v. Gulsby Engineering, Inc*. *See* 356 S.W.3d 54, 63–65 (Tex. App.—Houston [1st Dist.] 2011, no pet.). In the *Gulf Liquids* case two provisions in the contract indicated that a general contractor had to provide evidence that its subcontractors had been paid as a condition precedent to receiving payment. *See id*. at 63–64. Nonetheless, the First Court of Appeals held that the contract did not unambiguously make the provision of this evidence a condition precedent because a third provision in the contract indicated that providing this evidence was not a condition precedent to the general contractor's right to payment. *See id*. at 63–65. The *Gulf Liquids* case is not on point because no provision in the Joint Check Agreement indicates that the provision of complete invoices and delivery tickets is not a condition precedent to CCC Group's obligation under the agreement to issue checks made jointly payable to J.P. Mack and Enduro. *See id*.

Enduro also relies upon the Supreme Court of Texas's opinion in *Solar*

14

*Applications Engineering, Inc. v. T.A. Operating Corp. See* 327 S.W.3d 104, 108–12 (Tex. 2010). In that case, the high court held that contractual language requiring a general contractor to provide complete and effective releases or waivers of lien rights along with the general contractor's application was not a condition precedent to the owner's obligation to make the final payment. *See id*. In *Solar*, the contract did not contain any language making the owner's obligation to make the final payment conditional on the general contractor's provision of complete and effective releases or waivers of lien rights. *See id*. at 109–110. The *Solar* case is not on point. Likewise, the *Hirschfeld Steel* case from this court is not on point because the contract language in that case materially differs from the language of the Joint Check Agreement. *See Hirschfeld Steel Co., Inc.*, 201 S.W.3d at 279–82.

Enduro asserts that construing the Joint Check Agreement so that the provision of complete invoices and delivery tickets to CCC Group is a condition precedent would create an absurd result because Enduro did not have J.P. Mack's invoices. We have concluded above that any joint check that CCC Group might be obligated to issue for Goods or Services would be based on the amount Enduro charged J.P. Mack for the Goods or Services. Thus, there is no need for Enduro to provide CCC Group with J.P. Mack's invoices, and it is not an absurd result to construe the provision of complete invoices from Enduro as a condition precedent.

Enduro asserts that construing the Joint Check Agreement so that the provision of complete invoices and delivery tickets to CCC Group is a condition precedent would create an absurd result because Enduro did not have any delivery tickets given that its packing slips were delivery tickets that Enduro delivered to the site of the Project with the siding. Construing the Joint Check Agreement so that the provision of complete invoices and delivery tickets to CCC Group is a condition precedent would not create an absurd result. Enduro had the ability to

generate delivery tickets and provide them to CCC Group. In fact, Enduro argues on appeal that the trial evidence is legally sufficient to support a finding that Enduro did so.

According to Enduro, trial testimony from corporate representatives of each of the parties unequivocally established that the Joint Check Agreement did not require Enduro to submit its invoices to trigger CCC Group's obligation to issue joint checks. Enduro cites the testimony of Jeffrey Huebner, a regional manager at CCC Group, Adam Vodanovich, the owner of J.P. Mack, and Tim Broussard, Enduro's Chief Executive Officer. In Huebner's testimony, he states that J.P. Mack emailed invoices to an email address and that invoices sent to this address were forwarded to CCC Group's accounts payable department and its corporate office. In Vodanovich's testimony, he says that J.P. Mack's suppliers do not send invoices to the general contractor and that the suppliers send invoices to J.P. Mack and J.P. Mack sends invoices to the general contractor. In Broussard's testimony, he states that J.P. Mack would submit an invoice to CCC Group after it received an invoice from Enduro. In none of this testimony did any witness address the terms of the Joint Check Agreement or what was required under that agreement to trigger CCC Group's obligation to issue a joint check.

Enduro also cites Broussard's testimony that Enduro did not send invoices directly to CCC Group because CCC Group was the customer of Enduro's customer and because it would be "bad business" for Enduro to reveal to CCC Group how much Enduro was charging J.P. Mack for siding, which would show CCC Group what J.P. Mack's profit margin was on the siding. Again, in this testimony, Broussard does not address the terms of the Joint Check Agreement or what was required under that agreement to trigger CCC Group's obligation to issue a joint check.

16

Enduro argues that CCC Group's obligation under the Joint Check Agreement to issue joint checks would be rendered meaningless if CCC Group could claim after the fact that it did not have to issue any joint checks because CCC Group did not receive complete invoices and delivery tickets, without having requested these documents. Under the plain text of the Joint Check Agreement, the provision of complete invoices and delivery tickets to CCC Group for Goods or Services is a condition precedent to any obligation of CCC Group to issue a check jointly payable to J.P. Mack and Enduro for Goods or Services, and CCC Group need not ask that CCC Group be provided with complete invoices and delivery tickets. Thus, CCC Group's ability to assert that it had no obligation to issue a joint check because it was not provided with complete invoices and delivery tickets does not make CCC Group's obligation to issue joint checks meaningless; instead, it reflects that the provision of complete invoices and delivery tickets to CCC Group for Goods or Services is a condition precedent to any obligation of CCC Group to issue a check under the Joint Check Agreement.

We conclude that the provision of complete invoices and delivery tickets to CCC Group for Goods or Services is a condition precedent to any obligation of CCC Group to issue a check jointly payable to J.P. Mack and Enduro for the Goods or Services.[3] *See Martin Operating P'ship, LP*, 525 S.W.3d 726–27.

### 2. What is the meaning of "complete invoices"?

The term "complete invoices" is not defined in the Joint Check Agreement,

---

[3] In its response in opposition to CCC Group's Motion for Judgment Notwithstanding the Verdict, Enduro stated that "Enduro does not dispute that the Joint Check Agreement ("JCA") contained a condition precedent which provided that [CCC Group] receive complete invoices and delivery tickets." Because we conclude that the provision of complete invoices to CCC Group for Goods or Services is a condition precedent, we need not and do not address CCC Group's argument that this statement constitutes a judicial admission by Enduro that the provision of complete invoices to CCC Group is a condition precedent to any obligation of CCC Group to issue a check jointly payable to J.P. Mack and Enduro for the Goods or Services.

17

so we are to give this term its plain, ordinary, and generally accepted meaning unless the Joint Check Agreement itself shows the term to be used in a technical or different sense. *See Heritage Res., Inc.*, 939 S.W.2d at 121–22; *BP Oil Pipeline Co. v. Plains Pipeline, L.P.*, 472 S.W.3d 296, 304 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). Because the Joint Check Agreement does not show that "complete invoices" is used in a technical or different sense in the agreement, we give the term its plain, ordinary, and generally accepted meaning. *See Heritage Res., Inc.*, 939 S.W.2d at 121–22; *BP Oil Pipeline Co.*, 472 S.W.3d at 304–05. In this context, the Merriam-Webster Dictionary defines "complete" as "having all necessary parts, elements, or steps." Complete, Merriam-Webster Dictionary, http://merriam-webster.com/dictionary/complete (last visited Aug. 25, 2021) (defining "complete" as "having all necessary parts, elements, or steps"). The parties have not cited any cases addressing the definition of "complete invoices." In *Wheeling Steel Corporation v. Fox*, the Supreme Court of the United States indicated that "complete invoices" for materials must contain a description of the materials and the price for the materials.[4] *See* 298 U.S. 193, 206 (1936) (stating that "The other plants prepare complete invoices with the exception of information relating to the price of materials described. [These] invoices are then forwarded to Wheeling where they are completed and mailed to the customer"). We conclude that under the plain, ordinary, and generally accepted meaning of the term, a "complete invoice" for siding must describe the siding and state the price charged for the siding. *See id.*; *see also* Complete, Merriam-Webster Dictionary, http://merriam-webster.com/dictionary/complete (last visited Aug. 25, 2021). We concluded above that under the Joint Check Agreement, any joint check that CCC

---

[4] The court in *Wheeling Steel Corporation v. Fox* dealt with due process and equal protection issues, and the part of the court's opinion that we cite is not a binding precedent in today's case. *See* 298 U.S. 193, 204–16 (1936).

18

Group might be obligated to issue for the Goods or Services would be based on the amount Enduro charged J.P. Mack for the Goods or Services. Therefore, under the plain, ordinary, and generally accepted meaning of the term, a "complete invoice" for siding must describe the siding and state the price charged for the siding by Enduro.

### 3. Does the trial evidence conclusively prove that CCC Group waived the "complete invoices" condition precedent?

On appeal, Enduro argues that even if the provision of complete invoices to CCC Group for Goods or Services is a condition precedent to any obligation of CCC Group to issue a check jointly payable to J.P. Mack and Enduro for the Goods or Services (the "Complete Invoices Condition"), the trial evidence conclusively proves that CCC Group waived this condition precedent. Waiver may be asserted against a party who intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming the known right. *See Rima Group, Inc. v. Janowitz*, 573 S.W.3d. 505, 510 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Waiver is largely a matter of intent, and for implied waiver to be found through a party's conduct, intent must be demonstrated clearly by the surrounding facts and circumstances. *See id*. Ordinarily waiver is a question of fact, but waiver may be decided as a matter of law based on undisputed evidence regarding the facts and circumstances. *See id*. at 790–91.

Enduro argues that CCC Group waived the Complete Invoices Condition by the following conduct: (1) Enduro allegedly "fully performed" by delivering the materials, which were incorporated into the Project; (2) CCC Group failed to object to the documents submitted by J.P. Mack regarding the materials; (3) CCC Group had actual knowledge of Enduro's performance; and (4) CCC Group reaped a financial benefit from Enduro's performance. Enduro had been supplying

19

materials ordered by J.P. Mack. It is undisputed that J.P. Mack had a contract with Enduro for the purchase of these materials. As discussed above, in the Joint Check Agreement, CCC Group does not guarantee J.P. Mack's debt to Enduro arising from the purchase of these materials; instead, CCC Group agrees to issue checks made jointly payable to J.P. Mack and Enduro under certain circumstances. The provision of complete invoices to CCC Group for Goods or Services is a condition precedent to any obligation of CCC Group to issue a check jointly payable to J.P. Mack and Enduro for the Goods or Services. *See Martin Operating P'ship, LP*, 525 S.W.3d 726–27. The Joint Check Agreement does not require CCC Group to object to any documents submitted by J.P. Mack if they do not constitute "complete invoices." If the Complete Invoices Condition does not occur and CCC Group has no obligation to issue a joint check, J.P. Mack still has the obligation to pay Enduro for the materials.

Today's case does not involve a situation in which CCC Group issued a joint check despite actual knowledge that the Complete Invoices Condition had not occurred. Instead, CCC Group did not issue any joint checks and contends this failure did not breach the Joint Check Agreement because the Complete Invoices Condition did not occur. In the absence of complete invoices, CCC Group was not in a position to know the amount for any joint check. Evidence that CCC Group failed to point out to Enduro that CCC Group was not being provided with "complete invoices" does not constitute conclusive proof that CCC Group intentionally relinquished its right to rely on the Complete Invoices Condition or that CCC Group engaged in intentional conduct inconsistent with claiming that right. *See Rima Group, Inc.*, 573 S.W.3d. at 510–13 (finding fact issue as to waiver); *Ward v. Washington*, No. 14-11-001083-CV, 2013 WL 3243138, at *3–4 (Tex. App.—Houston [14th Dist.] Jun. 25, 2013, no pet.) (mem. op.) (concluding

20

that the evidence did not conclusively prove that appellees waived a condition precedent).

Enduro cites several cases in support of its argument that the trial evidence conclusively proves that CCC Group waived this condition precedent. *Mar-Len of Louisiana, Inc. v. Gorman-Rupp Company* is not on point because the court in that case held that the defendant could not complain about the failure of the plaintiff to completely satisfy the conditions precedent because the defendant lost its ability to assert its procedural rights when the defendant repudiated the contract. *See* 795 S.W.2d 880, 887–88 (Tex. App.—Beaumont 1990, writ denied). No party contends that CCC Group repudiated the Joint Check Agreement. In *Bekins Moving & Storage Company v. Williams*, the court found that the alleged conditions precedent were covenants rather than conditions and that the defendant had adjusted the plaintiff's claim and tendered payment on the claim without insisting that the plaintiff comply with the alleged conditions. *See* 947 S.W.2d 568, 576 (Tex. App.—Texarkana 1997, no writ). The Complete Invoices Condition is a condition precedent, and CCC Group did not issue a joint check despite the non-occurrence of this condition. Thus the *Bekins* case is not on point. The statements Enduro relies on from *National Union Fire Insurance Company v. John Zink Company* and from *Purvis Oil Company v. Hillin* are obiter dicta that we do not find persuasive as applied to today's case. *See* No. 13-08-00589-CV, 2010 WL 4523760, at *16–17 (Tex. App.—Corpus Christi Nov. 10, 2010, pet. denied) (mem. op.); 890 S.W.2d 931, 936–37 (Tex. App.—El Paso 1994, no writ).

Under the applicable standard of review, we conclude that the trial evidence does not conclusively prove that CCC Group waived the Complete Invoices Condition. *See Rima Group, Inc.*, 573 S.W.3d. at 510–13; *Ward*, 2013 WL 3243138, at *3–4.

21

### 4. *Is the trial evidence legally sufficient to support a finding that the Complete Invoices Condition occurred?*

We now address whether the trial evidence is legally sufficient to support a finding that the Complete Invoices Condition occurred. When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex. 2005). We must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* Jurors are the sole judges of witness credibility and the weight to give to testimony. *See id.* at 819.

Plaintiff's Exhibit 2 contains invoices from Enduro to J.P. Mack describing the goods ordered and shipped and the price charged for the goods. Timothy Broussard, Enduro's Chief Executive Officer, testified at trial that Plaintiff's Exhibit 2 contains the unpaid invoices that Enduro sent to J.P. Mack after the execution of the Joint Check Agreement. Presuming for the sake of argument that these invoices are "complete invoices," no evidence at trial showed that CCC Group had been provided with these invoices.

Defendant's Exhibit 3 contains invoices from J.P. Mack to CCC Group. These invoices do not contain detailed descriptions of the goods or services for which J.P. Mack was invoicing CCC Group. For example, J.P. Mack Invoice number 2127 refers to two items. For the first, the "Quantity" is stated as "1," and the description is "Micro-STG Area 100." For this item, the invoice recites that the price per item is "$15,272.83" and that the "Amount" for that item is "$15,272.83" For the second item the "Quantity" is "1," and the description is "MCC." For this

item, the invoice recites that the price per item is "$27,061.55" and that the "Amount" for that item is "$27,061.55."

"Micro-STG Area 100"and "MCC" each refer to a structure at the Mosaic facility on which J.P. Mack was installing siding under the Subcontract. For each of these items, the invoice states that the "Item Code" is "Siding," though this code



# Invoice

| Date | Invoice # |
|---|---|
| 3/5/2012 | 2127 |

**JP MACK INDUSTRIES, LLC**

601 S. Clark Street
New Orleans, LA 70119

**Bill To**

CCC Group, Inc.
P.O. Box 200350
San Antonio, TX 78220-0350

**Ship To**

9959 Hwy 18 Gate 5
St. James, LA 70086

| P.O. Number | Terms | | Rep | Project |
|---|---|---|---|---|
| | | | | Mosaic Faustina |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|---|---|---|---|---|---|
| 1 | Siding | Micro-STG Area 100 | | 15,272.83 | 15,272.83 |
| 1 | Siding | MCC | | 27,061.55 | 27,061.55 |
| | | Job# BJH1584 | | | |
| | | Work Release #004 | | | |
| | | Short Form MSA#JPM2011 | | | |

PLEASE REMIT PAYMENTS:

J P MACK INDUSTRIES, LLC
601 S. Clark Street
New Orleans, LA 70119

| | | |
|---|---|---|
| **Total** | | $42,334.38 |
| **Balance Due** | | $0.00 |

could include siding services as well as siding materials. The evidence at trial showed that Enduro provided only materials to J.P. Mack. J.P. Mack, rather than Enduro, provided the siding services. In this invoice J.P. Mack does not specify whether the charges are for siding services, siding materials, or for both. To the extent J.P. Mack is invoicing for services, J.P. Mack does not specify the amount of services. To the extent J.P. Mack is invoicing for materials, J.P. Mack does not specify the amount of materials. If J.P. Mack is invoicing for goods and services, J.P. Mack does not specify how much of the charge is for goods or how much is for services.

A review of the J.P. Mack invoices in Defendant's Exhibit 3 shows:

- None of the invoices mentions Enduro or any amount that Enduro may be charging for any materials Enduro may have supplied for the Project.
- None of the invoices identified a charge as being for materials supplied by Enduro.
- None of the invoices indicate to CCC Group the amount of any debt owed by J.P. Mack to Enduro.
- None of the invoices asks CCC Group to issue a check made jointly payable to J.P. Mack and Enduro. Each invoice asks that CCC Group remit payment to J.P. Mack.

At trial, Adam Vodanovich, the owner of J.P. Mack was asked if every invoice J.P. Mack submitted to CCC Group was in accordance with CCC Group's instructions. Vodanovich responded in the affirmative. Vodanovich was then asked if every invoice J.P. Mack submitted was a complete invoice, and he answered, "Correct." Vodanovich did not explain why he thought that every invoice was a complete invoice. Vodanovich did not state that every invoice was a complete invoice as to the materials Enduro supplied to the Project. Vodanovich's conclusory statement would not enable reasonable and fair-minded people to find that CCC Group had been provided with "complete invoices." *See Coastal Transp.*

24

*Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (concluding that conclusory testimony is incompetent and legally insufficient to support a judgment); *Lenox Barbeque & Catering, Inc. v. Metropolitan Transit Auth. of Harris County*, 489 S.W.3d 529, 535 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (stating that "[a] conclusory statement is no evidence").

Enduro asserts that nothing in the Joint Check Agreement states that Enduro is required to invoice CCC Group.  We agree that the Joint Check Agreement does not require Enduro to invoice CCC Group or to send its invoices for materials for the Project to CCC Group. As discussed above, the provision of complete invoices and delivery tickets to CCC Group for Goods or Services is a condition precedent to any obligation of CCC Group to issue a check jointly payable to J.P. Mack and Enduro for the Goods or Services. Thus, if no one had provided complete invoices to CCC Group for Goods or Services and Enduro wanted CCC Group to have an obligation to issue a joint check, Enduro had to provide complete invoices to CCC Group for the condition precedent to occur and trigger CCC Group's obligation. Nonetheless, Enduro had no obligation under the Joint Check Agreement to provide complete invoices to CCC Group.

Enduro states that the "proper procedure" was for Enduro to submit invoices for the siding materials to J.P. Mack, not to CCC Group. Enduro cites trial testimony indicating that Enduro would invoice J.P. Mack and J.P. Mack would invoice CCC Group. Presuming for the sake of argument that the contractual relationships among the parties required Enduro to invoice J.P. Mack for the materials it supplied to J.P. Mack and for J.P. Mack to invoice CCC Group for the goods and services J.P. Mack provided, including the siding materials obtained from Enduro, such requirements do not preclude Enduro from providing complete invoices for its materials to CCC Group. Enduro has not cited any contractual

provision precluding it from providing these invoices.

Enduro also argues that nothing in the Joint Check Agreement says that J.P. Mack must indicate in its invoices that J.P. Mack is indebted to Enduro. Enduro is correct that nothing in the Joint Check Agreement says this, and the agreement does not obligate J.P. Mack to indicate in its invoices that J.P. Mack is indebted to Enduro. Nonetheless, under the Joint Check Agreement, any joint check that CCC Group might be obligated to issue for the Goods or Services would be based on the amount Enduro charged J.P. Mack for the Goods or Services, and the provision of complete invoices and delivery tickets to CCC Group for Goods or Services is a condition precedent to any obligation of CCC Group to issue a check jointly payable to J.P. Mack and Enduro for the Goods or Services. Thus, if J.P. Mack's invoices were not complete invoices, if nobody else had provided complete invoices to CCC Group for Goods or Services, and if Enduro wanted CCC Group to have the obligation to issue a joint check, Enduro had to provide complete invoices to CCC Group for the condition precedent to occur and trigger CCC Group's obligation.

According to Enduro, it would make no sense to require J.P. Mack to identify Enduro as the siding supplier because, after Enduro replaced Resolite as the siding supplier, CCC Group and J.P. Mack knew that Enduro was the only siding supplier. As discussed above, for an invoice to constitute a complete invoice, the invoice must describe the siding materials supplied and state the price charged for the siding by Enduro. This makes sense because it allows CCC Group to determine the amount of the joint check that it must issue if an obligation to issue a joint check arises under the Joint Check Agreement.

Enduro asserts that nothing in the Joint Check Agreement says that J.P. Mack invoices should instruct CCC group to issue payment to Enduro. Enduro

26

also notes that testimony at trial showed that CCC Group's accounts payable department never complained that J.P. Mack submitted incomplete invoices or that they did not know who the siding supplier was. Though this observation about the Joint Check Agreement and these descriptions of the trial evidence are correct, they are not relevant to the issue of whether the trial evidence is legally sufficient to support a finding that CCC Group had been provided with "complete invoices."

Enduro relies on trial evidence that CCC Group did not put specific procedures in place to ensure compliance with the Joint Check Agreement and evidence indicating that nobody in CCC Group's accounts payable department was aware of the Joint Check Agreement until September 2012, when Enduro employee Kay Gause called an employee at the accounts payable department asking about payment from CCC Group to Enduro under the Joint Check Agreement. Enduro asserts that CCC Group's accounts payable department had never heard about the Joint Check Agreement until Gause's call after completion of the Project. Enduro argues that "[a]ssuming all the rigid technicalities were in place as [CCC Group] advocates, what [CCC Group] does not explain is how that would have made any difference in this case since [CCC Group's] accounts payable department was unaware of any duty to issue joint checks." Enduro contends it would not have mattered.

Enduro's argument does not comport with the essential elements a plaintiff must prove in a breach-of-contract claim. If a contracting party had no obligation under a contract to issue a joint check because a condition precedent had not occurred, the contracting party cannot be liable for failing to issue the joint check, regardless of the measures the contracting party took to ensure compliance with the contract or to make its accounts payable department aware of the contract. The measures a party took to attempt to comply with its contractual obligations are not

relevant to the elements that a plaintiff must prove to recover for breach of contract, unless the contract imposes on the party an obligation to take these measures. *See Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). Though it may have been prudent to do so, the Joint Check Agreement does not impose on CCC Group any obligation to notify its accounts payable department of the existence of the Joint Check Agreement. Any failure of CCC Group to do so is not relevant to the issue of whether the Complete Invoices Condition occurred or whether CCC Group failed to comply with the Joint Check Agreement. *See id.*

Under the applicable standard of review, we conclude that the trial evidence is legally insufficient to support a finding that the Complete Invoices Condition occurred, and thus the trial evidence is legally insufficient to support the jury's finding in response to Question 1 that CCC Group failed to comply with the Joint Check Agreement.[5] *See CDI Engineering Group, Inc. v. Administrative Exch., Inc.*, 222 S.W.3d 544, 548–51 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (concluding that trial evidence was legally insufficient to support finding that condition precedent occurred). Therefore, we sustain the part of CCC Group's first issue in which CCC Group asserts that this court should reverse the trial court's judgment against CCC Group on Enduro's breach-of-contract claim based on (1) the failure of the trial evidence to conclusively prove that CCC Group waived the Complete Invoices Condition, and (2) the legal insufficiency of the trial evidence to support a finding that the Complete Invoices Condition occurred, and thus the legal insufficiency of the trial evidence to support the jury's answer to Question 1.[6]

---

[5] We need not and do not address: (1) whether the trial evidence is legally insufficient to support a finding that the "delivery tickets" condition precedent occurred, or (2) CCC Group's argument that Enduro waived any right it may have had to a joint check from CCC Group.

[6] We need not and do not address the remainder of CCC Group's first issue.

Therefore, CCC Group is entitled to a reversal of the trial court's judgment as to Enduro's breach-of-contract claim against CCC Group and rendition of a judgment that Enduro take nothing on this claim.[7] *See id.* Because we are rendering judgment that Enduro take nothing on its breach-of-contract claim against CCC Group, we also sustain CCC Group's argument under its sixth issue that this court should reverse and render judgment that Enduro take nothing on its request for attorney's fees under Chapter 38 of the Civil Practice and Remedies Code.[8] *See Ashford Partners, Ltd. v. ECO Res., Inc.*, 401 S.W.3d 35, 40 (Tex. 2012); Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (West, Westlaw through 2019 R.S.).

## B. Is the evidence legally insufficient to support the jury's finding that Enduro relied on CCC Group's alleged misrepresentation and thereby suffered injury?

As to Enduro's claims against CCC Group, the jury found in Enduro's favor on the breach-of-contract claim and the fraud claim. The breach-of-contract claim afforded Enduro a greater recovery than the fraud claim, and Enduro elected to recover judgment against CCC Group under its breach-of-contract claim. On appeal, CCC Group has challenged Enduro's breach-of-contract claim as well as the fraud claim, which was not made the basis of the trial court's judgment but which Enduro might elect as an alternative basis for recovery under the *Boyce Iron Works* case. *See Boyce Iron Works, Inc. v. Southwestern Bell Telephone Co.*, 747

---

[7] On appeal, Enduro argues that because CCC Group challenges the sufficiency of the evidence to support the jury's answer to Question 1 and does not state that there is "no evidence" to support this answer, CCC Group asserts only a factual sufficiency challenge to this answer and thus is only entitled to a remand for a new trial. Though CCC Group does not assert that there is "no evidence" to support the jury's answer to Question 1, CCC Group asserts several times that the evidence is legally insufficient to support this answer and that this court should reverse and render a take-nothing judgment as to Enduro's breach-of-contract claim against CCC Group. CCC Group asserts a legal sufficiency challenge rather than a factual sufficiency challenge to this answer. Enduro's argument to the contrary lacks merit.

[8] We need not and do not address CCC Group's remaining challenges to the trial court's award of attorney's fees to Enduro.

S.W.2d 785, 787 (Tex. 1988) (stating that "[w]hen the jury returns favorable findings on two or more alternative theories, the prevailing party need not formally waive the alternative findings. That party may seek recovery under an alternative theory if the judgment is reversed on appeal"). In today's case, on original submission, CCC Group has challenged Enduro's fraud claim—an alternative theory of recovery under which Enduro may elect to recover on rehearing if this court reverses and renders a take-nothing judgment as to the breach-of-contract claim. Enduro has responded by submitting briefing in response to CCC Group's challenges to the fraud claim. In this context, we may address CCC Group's challenges to the fraud claim on original submission, and we have decided to address CCC Group's challenge to the jury's fraud findings in the fifth issue on original submission. *See Flutobo, Inc. v. Holloway*, 419 S.W.3d 622, 628 & n.4 (Tex. App.—Houston [14th Dist.] 2013, pet. denied); *Hatfield v. Solomon*, 316 S.W.3d 50, 60 n. 3 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

Under its fifth issue, CCC Group asserts that Enduro is not entitled to judgment on its fraud claim because with the non-occurrence of the condition precedent, CCC Group had no duty to issue a joint check, and Enduro could not as a matter of law have caused damages to Enduro. Liberally construing CCC Group's briefing, CCC Group argues that the evidence is legally insufficient to support the jury's finding that Enduro relied on CCC Group's alleged misrepresentation and thereby suffered injury. In Question 5, the trial court asked the jury, "Did CCC Group, Inc. commit fraud against Enduro Composites, Inc.?" The jury answered, "Yes." The trial court instructed the jury that "Fraud occurs when— 1. a party makes a material misrepresentation, and 2. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and 3. the misrepresentation is made with the

intention that it should be acted on by the other party, and 4. the other party relies on the misrepresentation and thereby suffers injury." The trial court also instructed the jury that "Misrepresentation" means a promise of future performance made with an intent, at the time the promise was made, not to perform as promised."

In the trial court and on appeal, Enduro has based its fraud claim on CCC Group's alleged execution of the Joint Check Agreement with an intent not to perform the agreement as promised. We presume, without deciding, that the evidence is sufficient to support a finding that CCC Group made a material misrepresentation by executing the Joint Check Agreement with an intent not to perform the agreement as promised and that Enduro relied on this misrepresentation. But, as discussed above, the trial evidence is legally insufficient to support a finding that the Complete Invoices Condition occurred, and thus the trial evidence is legally insufficient to support the jury's finding in response to Question 1 that CCC Group failed to comply with the Joint Check Agreement. Because the trial evidence is legally insufficient to show that CCC Group failed to comply with the Joint Check Agreement, the evidence likewise is legally insufficient to support a finding that Enduro suffered injury by relying on CCC Group's promised performance in the Joint Check Agreement. *See Christenberry v. Webber*, No. 01-04-00109-CV, 2006 WL 304838, at *10–11 (Tex. App.—Houston [1st Dist.] Feb. 9. 2006, no pet.) (presuming that defendant made a misrepresentation by executing settlement agreement with no intention of performing the agreement and holding that no evidence supported the fraud claim because the evidence was legally insufficient to support the jury's finding that the defendant breached the settlement agreement) (mem. op.). Therefore, we sustain CCC Group's fifth issue and conclude that as a matter of law Enduro is not entitled

31

to judgment against CCC Group based on Enduro's fraud claim.[9] *See id*.

Having determined that the trial evidence is legally insufficient to support an essential element of Enduro's breach-of-contract claim and an essential element of its fraud claim, we reverse the parts of the trial court's judgment in which the trial court rendered judgment in favor of Enduro and against CCC Group, and we render judgment that Enduro take nothing against CCC Group.[10] *See CDI Engineering Group, Inc.*, 222 S.W.3d at 548–51. By doing so, we do not disturb the trial court's judgment in favor of Enduro and against J.P. Mack.

**C. Has CCC Group shown that this court should reverse the parts of the trial court's judgment based on J.P. Mack's breach-of-contract claim and render judgment that J.P. Mack take nothing on the claim?**

We now address the challenges to the trial court's rendition of judgment in favor of J.P. Mack and against CCC Group, in which CCC Group seeks reversal and rendition of a take-nothing judgment in favor of CCC Group. In these challenges, CCC Group argues: (1) the trial evidence was legally insufficient to prove any damages resulting from CCC Group's failure to comply with the Subcontract because no evidence shows that J.P. Mack's alleged damages were reasonable and necessary; (2) the trial evidence conclusively proved that J.P. Mack failed to comply with section 5.5 of the Subcontract; (3) the trial evidence conclusively proved that J.P. Mack failed to comply with section 6.4 of the Subcontract; (4) J.P. Mack's breach of the Subcontract precludes its recovery

---

[9] We need not and do not address CCC Group's fourth issue, in which it argues that the evidence is legally and factually insufficient to support the jury's findings as to the intent and material representation elements of Enduro's fraud claim.

[10] We need not and do not address any of the following: (1) CCC Group's argument that this court should reverse Enduro's judgment against CCC Group based on paragraph 5 of the Joint Check Agreement; (2) CCC Group's arguments under the third issue asserting charge error as to various affirmative defenses that CCC Group asserted against Enduro's breach-of-contract claim; and (3) CCC Group's arguments under the third issue asserting charge error based on the trial court's failure to instruct the jury on materiality regarding Enduro's breach-of-contract claim.

under that contract; and (5) J.P. Mack was not entitled to recover damages given CCC Group's right to withhold payment to J.P. Mack pending resolution of Enduro's claim.

**1.** ***Is the trial evidence legally insufficient to prove any damages resulting from CCC Group's failure to comply with the Subcontract because no evidence shows that J.P. Mack's alleged damages were reasonable and necessary?***

Under its second issue, CCC Group asserts that J.P. Mack sought to recover remedial damages under its breach-of-contract claim, and therefore, under the Supreme Court of Texas's opinion in *McGinty v. Hennen*, J.P. Mack had to prove that the damages it sought were reasonable and necessary. *See* 372 S.W.3d 625, 627 (Tex. 2012). According to CCC Group, no trial evidence shows that J.P. Mack's damages were reasonable and necessary and therefore the evidence is legally insufficient to support the jury's damages finding in response to Question 7. Though Question 7 did not require that J.P. Mack's damages be reasonable and necessary, we presume for the sake of argument that CCC Group's objection to Question 7 during the charge conference constituted an objection to this question on the ground that the jury should be instructed that the damages must be reasonable and necessary. The trial court overruled this objection. Therefore, if this proposition is correct, we must measure the sufficiency of the evidence under this legal standard, rather than under the charge the trial court gave the jury. *See Tractebel Energy Marketing, Inc. v. E.I. Du Pont De Nemours & Co.*, 118 S.W.3d 60, 68–69 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

Remedial damages are measured by "the cost to complete or repair less the unpaid balance on the contract price." *McGinty v. Hennen,* 372 S.W.3d 625, 627 (Tex. 2012) (per curiam). A party seeking to recover remedial damages must prove that the damages sought are reasonable and necessary. *Id.* To establish that, the

plaintiff must show more than simply "the nature of the injuries, the character of and need for the services rendered, and the amounts charged therefor." *Id*. Instead, some other "evidence showing that the charges are reasonable" is required. *Id*.

CCC Group contends that J.P. Mack sought to recover remedial damages and thus had to prove that the remedial damages are reasonable and necessary. *See id*. The record does not support CCC Group's contention. In its cross-claim against CCC Group, J.P. Mack alleged that "[p]ursuant to the [Subcontract] and all change orders, [J.P. Mack] rendered all services and materials as it was obligated to do. But, to date, [J.P. Mack] has been only partially paid for its services and provided materials. . . [J.P. Mack] is still owed $639,593.49 for its services and provided materials." The record does not reflect that J.P. Mack sought to recover remedial damages based on CCC Group's alleged breach of the Subcontract, and in Question 7, the trial court did not instruct the jury to make its damage finding based on remedial damages. J.P. Mack, a subcontractor, sought to recover damages based on services and materials that J.P. Mack allegedly provided under the Subcontract but for which CCC Group, the contractor, did not pay J.P. Mack.

Under the Subcontract, CCC Group did not agree to construct any structure for J.P. Mack, and J.P. Mack did not seek damages for CCC Group's alleged breach of contract based on "the cost to complete or repair." *Id*. J.P. Mack did not seek remedial damages, nor was J.P. Mack required to do so. Therefore, the rule requiring proof that remedial damages are reasonable and necessary does not apply to the damages sought and obtained by J.P. Mack based on CCC Group's breach of the Subcontract. *See Balfour Beatty Rail, Inc. v. Kansas City Southern Ry. Co.*, 173 F.Supp.3d 363, 459 (N.D. Tex. 2016) (holding that the rule requiring proof that remedial damages are reasonable and necessary did not apply to the proof of damages for breach of a construction contract because the benefit of the bargain

rather than remedial damages was the proper measure of damages under the facts of that case), *aff'd as modified on other grounds by*, 725 Fed. Appx. 256, 257 (5th Cir. 2018); *Classic Superoof, LLC v. Bean*, No. 05-12-00941-V, 2014 WL 5141660, at *7 (Tex. App.—Dallas Oct. 14, 2014, pet. denied) (holding that the rule requiring proof that remedial damages are reasonable and necessary did not apply to the proof of damages for breach of a contract because the plaintiff sought and obtained damages based on a rescission measure of damages rather than remedial damages and indicating that the rescission measure of damages was proper under the facts of that case) (mem op.). Therefore, any failure of the evidence to prove that J.P. Mack's damages were reasonable and necessary does not make the evidence legally insufficient to support the jury's answer to Question 7.[11] *See Balfour Beatty Rail, Inc.*, 173 F.Supp.3d at 459; *Classic Superoof, LLC*, 2014 WL 5141660, at *7.

2. ***Did J.P. Mack have the burden of proving its compliance with section 5.5 of the Subcontract as an alleged condition precedent to CCC Group's obligation to pay under the Subcontract?***

Under its second issue, CCC Group indicates that J.P. Mack's compliance with section 5.5 was a condition precedent to CCC Group's obligation to pay J.P. Mack under the Subcontract. CCC Group asserts that it is entitled to reversal of the judgment in favor of J.P. Mack and rendition of judgment because there was no

---

[11] CCC Group states in passing in its appellant's brief that CCC Group performed work that allegedly was J.P. Mack's responsibility and invoiced J.P. Mack $99,000. CCC Group cites trial testimony regarding its October 16, 2013 invoice sent to J.P. Mack for this alleged work. The jury found that J.P. Mack materially failed to comply with the Subcontract. But, in response to Question 8 the jury found that a preponderance of the trial evidence did not prove that any damage to CCC Group resulted from J.P. Mack's failure to comply with the Subcontract. On appeal, CCC Group has not challenged the sufficiency of the trial evidence to support the jury's answer to Question 8, nor has CCC Group asserted that the trial evidence conclusively proved that J.P. Mack was obligated to pay CCC Group based on this work invoiced in October 2013. Even if CCC Group had made this assertion, we would not conclude that the trial evidence conclusively proved this point.

evidence that J.P. Mack complied with section 5.5. We presume for the sake of argument that CCC Group has sufficiently briefed an argument that the trial evidence is legally insufficient to support the jury's finding in response to Question 2 because compliance by J.P. Mack with section 5.5 was a condition precedent to CCC Group's obligation to pay J.P. Mack under the Subcontract and because the trial evidence is legally insufficient to support a finding that this condition occurred.

In its cross-claim, J.P. Mack alleged that all conditions precedent to its claims for relief had been performed or had occurred. In its answer, CCC Group did not assert that section 5.5 was a condition precedent, nor did CCC Group specifically deny that J.P. Mack had complied with section 5.5. Texas Rule of Civil Procedure 54 provides:

> In pleading the performance or occurrence of conditions precedent, it shall be sufficient to aver generally that all conditions precedent have been performed or have occurred. When such performances or occurrences have been so plead, the party so pleading same shall be required to prove only such of them as are specifically denied by the opposite party.

Tex. R. Civ. P. 54. Because J.P. Mack pleaded that all conditions precedent to its recovery against CCC Group had been performed or had occurred, J.P. Mack was required to prove only the conditions precedent that CCC Group specifically denied. *See* Tex. R. Civ. P. 54; *Community Bank & Trust v. Fleck*, 107 S.W.3d 541, 542 (Tex. 2002). In its answer, CCC Group denied "that all conditions precedent have been performed or have occurred." But, this is a general denial, not a specific denial under Rule 54. *See* Tex. R. Civ. P. 54; *Coastal Terminal Operators v. Essex Crane Rental Corp.*, No. 14–02–00627–CV, 2004 WL 1795355, at *7 (Tex. App.—Houston [14th Dist.] Aug. 12, 2004, pet. denied) (holding that general statement by defendant denying that all conditions

precedent have occurred or been performed is not sufficient under Rule 54 to require plaintiff to prove any alleged conditions precedent) (mem. op.). Because CCC Group did not specifically deny the alleged condition precedent of J.P. Mack's compliance with section 5.5, J.P. Mack did not have to prove at trial that it complied with section 5.5.[12] *See* Tex. R. Civ. P. 54; *Bencon Management & General Contracting, Inc. v. Boyer, Inc.*, 178 S.W.3d 198, 203–05 (Tex. App.— Houston [14th Dist.] 2005, no pet.). Thus, even if the trial evidence were legally insufficient to prove that J.P. Mack complied with section 5.5, that insufficiency would not make the evidence legally insufficient to support the jury's finding in response to Question 2 that CCC Group materially failed to comply with the Subcontract. *See* Tex. R. Civ. P. 54; *Bencon Management & General Contracting, Inc.*, 178 S.W.3d at 203–05.

**3.** ***Did the trial evidence conclusively prove that J.P. Mack failed to comply with section 5.5 of the Subcontract?***

Under its second issue, CCC Group also asserts that the trial evidence conclusively proved that J.P. Mack failed to comply with the first sentence of section 5.5 in the Subcontract and that therefore this court should reverse the trial court's judgment as to J.P. Mack's breach-of-contract claim against CCC Group and render judgment that J.P. Mack take nothing. CCC Group asserts that a failure to comply with section 5.5 by J.P. Mack would constitute a waiver of J.P. Mack's breach-of-contract claim. In determining whether the trial evidence conclusively proved this point, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller,* 168 S.W.3d at 823. We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable

---

[12] We need not and do not decide whether compliance with section 5.5 by J.P. Mack was a condition precedent to CCC Group's obligation to pay J.P. Mack under the Subcontract.

factfinder could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* The factfinder is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819. Evidence is conclusive only if reasonable people could not differ in their conclusions. *See id.*

> In section 5.5's first sentence CCC Group and J.P. Mack agreed as follows:

> For each progress payment period, [J.P. Mack] shall submit its progress payment application to [CCC Group] for the Work performed to date no later than seven (7) calendar days prior to the date that [CCC Group's] progress payment application is required to be submitted to the Owner [Mosaic] under the Contract, unless otherwise agreed.

We conclude that this provision is unambiguous, and any parol evidence contrary to the unambiguous meaning of this provision is incompetent to change its meaning, even if no party objected to the parol evidence. *See White Oak Operating Co., LLC v. BLR Const. Cos., LLC*, 362 S.W.3d 725, 734 (Tex. App.—Houston [14th Dist.] 2011, no pet.). Under the unambiguous language of this provision, unless the parties agreed otherwise, for each progress-payment period, J.P. Mack was required to submit a progress-payment application to CCC Group for the Work performed to date no later than seven days before the date on which CCC Group was required to submit its progress-payment application to Mosaic under the CCC Group's contract with Mosaic. CCC Group points to trial testimony by Joe Garza, CCC Group's general counsel, that this provision is "important so that, you know, at the time that we send a bill to our client, that we capture all the costs and that we know where the project is and where the subcontractor is so that we can get paid timely. And likewise, our . . . subcontractors and vendors can be paid timely." CCC Group also asserts that uncontroverted trial evidence showed that J.P. Mack did not send any invoices to CCC Group in June, July, August, or

38

September of 2012. CCC Group also cites testimony by Jeff Huebner, the CCC Group regional manager for the region in which the Project was located, that Huebner first became aware that J.P. Mack was alleging that they were owed money by CCC Group around October, 2012 upon receipt of J.P. Mack's October 5, 2012 invoice, which CCC Group notes is after CCC Group received its final payment from Mosaic and after CCC Group learned that J.P. Mack had not fully paid Enduro.

No witness testified that J.P. Mack failed to comply with this part of section 5.5. The trial evidence did not contain CCC Group's contract with Mosaic, and no trial evidence showed the date on which CCC Group was required to submit its progress-payment application to Mosaic under CCC Group's contract with Mosaic. We presume for the purposes of our analysis that as to the last three items listed on J.P. Mack's October 5, 2012 invoice,[13] J.P. Mack did not submit its progress payment application to CCC Group no later than seven calendar days before the date that CCC Group was required to submit its progress payment application to Mosaic under the Contract between Mosaic and CCC Group. Nonetheless, no trial evidence addressed whether CCC Group and J.P. Mack "agreed otherwise" as provided in this part of section 5.5. After examining the trial evidence under the applicable standard of review, we conclude that the trial evidence did not conclusively prove that J.P. Mack failed to comply with the first sentence of section 5.5 in the Subcontract.[14] *See Hirschfeld Steel Co., Inc.*, 201 S.W.3d at 285, 287–88.

---

[13] These three items are (1) "Additional Siding on C-Train for Asbestos Removal"; (2) "Overtime not included in the contract"; and (3) "Equipment not included in the contract."

[14] We need not and do not decide whether a failure to comply with section 5.5 by J.P. Mack would constitute a waiver of J.P. Mack's breach-of-contract claim against CCC Group.

**4.** *Did the trial evidence conclusively prove that J.P. Mack failed to comply with section 6.4 of the Subcontract?*

Under its second issue, CCC Group asserts that the trial evidence conclusively proved that J.P. Mack failed to comply with section 6.4 of the Subcontract and that therefore this court should reverse the trial court's judgment as to J.P. Mack's breach-of-contract claim against CCC Group and render judgment that J.P. Mack take nothing. CCC Group argues that because the trial evidence conclusively proved that J.P. Mack failed to comply with section 6.4, the evidence also conclusively proved that J.P. Mack waived its breach-of-contract claim against CCC Group and that the trial court should have rendered judgment notwithstanding the jury's answers to Questions 2 and 4.

In section 6.4 CCC Group and J.P. Mack agreed as follows:

> [J.P. Mack] shall give [CCC Group] written notice of all claims within seven (7) days of [J.P. Mack's] knowledge of facts giving rise to the event for which claims is made; otherwise, such claims shall be deemed waived. All unresolved claims, disputes and other matters in question between CCC Group and J.P. Mack shall be resolved in the manner provided in this Agreement.

We conclude that this provision is unambiguous, and any parol evidence contrary to the unambiguous meaning of this provision is incompetent to change its meaning, even if no party objected to the parol evidence. *See White Oak Operating Co., LLC,* 362 S.W.3d at 734. Under the unambiguous language of this provision, J.P. Mack must give CCC Group written notice of all claims within seven days of J.P. Mack's knowledge of facts giving rise to the event for which claims is made; otherwise, such claims shall be deemed waived. CCC Group points to trial testimony by Joe Garza, CCC Group's general counsel, in which Garza provides incompetent parol evidence as to what Garza thinks the parties agreed to in section 6.4. Garza also testified that he had not seen anything like written

40

communication from J.P. Mack in June, July, August, or September that a claim for extra work was going to be submitted by invoice in October 2012. Garza further stated that he did not recall seeing anything in writing that put CCC Group on notice of a claim for overtime and equipment by J.P. Mack. Garza testified that section 6.4 is important to CCC Group because "it's important to be able — for us to be, like I said, to track costs as they're being in — as they're being incurred by us. And also, I mean, we have obligations to our client as well and might have some time frames to submit our own bills. And so we — you know, we try to do our best not to end up — you know, end up in payment disputes or, you know, that we've got late invoices or late supporting materials from subcontractors." According to Garza, section 6.4 "[k]eeps the project rolling smoothly. It keeps us paid so that we can keep our subcontractors and suppliers paid."

CCC Group also asserts that uncontroverted trial evidence showed that J.P. Mack did not send any invoices to CCC Group in June, July, August, or September of 2012. CCC Group cites testimony by Jeff Huebner, the CCC Group regional manager for the region in which the Project was located, that Huebner first became aware that J.P. Mack was alleging that they were owed money by CCC Group around October, 2012 upon receipt of J.P. Mack's October 5, 2012 invoice, which CCC Group notes is after CCC Group received its final payment from Mosaic and after CCC Group learned that J.P. Mack had not fully paid Enduro.

No witness testified that J.P. Mack failed to comply with section 6.4. No trial evidence addresses when J.P. Mack first gave notice of a breach-of-contract claim against CCC Group. No trial evidence addresses whether J.P. Mack gave CCC Group written notice of a breach-of-contract claim against CCC Group within seven days of the date on which J.P. Mack first had knowledge of facts giving rise to the event for which its breach-of-contract claim against CCC Group was made.

41

After examining the trial evidence under the applicable standard of review, we conclude that the trial evidence did not conclusively prove that J.P. Mack failed to comply with section 6.4 in the Subcontract.[15] *See Hirschfeld Steel Co., Inc.*, 201 S.W.3d at 285, 287–88.

### 5. Does the jury's finding that J.P. Mack breached the Subcontract preclude J.P. Mack from recovering on its breach-of-contract claim against CCC Group?

Under its second issue, CCC Group asserts on appeal that because the jury found in response to Question 4 that J.P. Mack materially failed to comply with the Subcontract, J.P. Mack may not recover against CCC Group on its claim for breach of the Subcontract. In response to Question 2, the jury found that CCC Group materially failed to comply with the Subcontract. By its answer to Question 4, the jury found that J.P. Mack materially failed to comply with the Subcontract. In response to Question 7, the jury found that $300,000 would fairly and reasonably compensate J.P. Mack for its damages that resulted from CCC Group's failure to comply with the Subcontract. By its answer to Question 8, the jury found that a preponderance of the trial evidence did not prove that any damage to CCC Group resulted from J.P. Mack's failure to comply with the Subcontract. The jury was not asked to find which party committed the first material breach of the Subcontract. On appeal, CCC Group does not assert that the trial evidence conclusively proved that J.P. Mack materially breached the Subcontract before CCC Group breached the Subcontract. Under binding precedent from this court, the jury's finding that

---

[15] We do not address whether section 16.071 of the Civil Practice and Remedies Code applies to section 6.4 of the Subcontract. *See* Tex. Civ. Prac. & Rem Code Ann §16.071(a). (West, Westlaw through R.S.) (stating that "[a] contract stipulation that requires a claimant to give notice of a claim for damages as a condition precedent to the right to sue on the contract is not valid unless the stipulation is reasonable. A stipulation that requires notification within less than 90 days is void."); *id*. §16.071(e) (stating that "[i]n a suit covered by this section or Section 16.070, it is presumed that any required notice has been given unless lack of notice is specifically pleaded under oath"). J.P. Mack has not raised this issue.

J.P. Mack materially failed to comply with the Subcontract does not, by itself, preclude J.P. Mack from recovering on its claim against CCC Group for breach of the Subcontract. *See Earth Power A/C and Heat, Inc. v. Page*, 604 S.W.3d 519, 525 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

### 6. *Do CCC Group's rights under section 5.8 of the Subcontract preclude J.P. Mack from recovering on its breach-of-contract claim against CCC Group?*

Under its second issue, CCC Group notes that J.P. Mack did not dispute its liability on Enduro's breach-of-contract claim and did not object to the trial court's rendition of a directed verdict in Enduro's favor on this claim. CCC Group asserts that J.P. Mack's failure to pay Enduro entitled CCC Group, under section 5.8 of the Subcontract to withhold payment from J.P. Mack or to reject a J.P. Mack payment application. According to CCC Group, because it was entitled to withhold payment from J.P. Mack under section 5.8 of the Subcontract, J.P. Mack was not entitled to recover on its breach-of-contract claim against CCC Group as a matter of law.

Section 5.8 of the Subcontract provides in its entirety as follows:

[CCC Group] may withhold payment and/or reject a [J.P. Mack] payment application or nullify a previously approved [J.P. Mack] payment application, in whole or in part, as may reasonably be necessary to protect [CCC Group] from loss or damage based upon: (1) [J.P. Mack's] failure to timely perform Work, (2) [J.P. Mack's] failure to properly pay subcontractors or suppliers, (3) [J.P. Mack's] failure to promptly correct defective or non-conforming Work, (4) third party claims involving [J.P. Mack] or reasonable evidence demonstrating that third party claims are likely to be filed unless and until [J.P. Mack] furnishes [CCC Group] with adequate security in the form of a surety bond, letter of credit or other collateral or commitment which are sufficient to discharge such claims if established. [CCC Group] has the right to retain the funds necessary to offset any damages or losses resulting from any such occurrences

43

noted herein.

We conclude that this provision is unambiguous, and any parol evidence contrary to the unambiguous meaning of this provision is incompetent to change its meaning, even if no party objected to the parol evidence. *See White Oak Operating Co., LLC,* 362 S.W.3d at 734. Under the unambiguous language of section 5.8, CCC Group may withhold payment to J.P. Mack, reject a J.P. Mack payment application, or nullify a previously approved J.P. Mack payment application, in whole or in part, as may reasonably be necessary to protect CCC Group from loss or damage based upon four items, including (1) J.P. Mack's failure to pay subcontractors or suppliers properly, and (2) third party claims involving J.P. Mack or reasonable evidence demonstrating that third party claims are likely to be filed. Under the section's plain text, CCC Group may choose not to exercise its rights under section 5.8 to withhold payment to J.P. Mack, reject a J.P. Mack payment application, or nullify a previously approved J.P. Mack payment application (collectively the "Section 5.8 Rights"). We presume that J.P. Mack's failure to properly pay Enduro triggered CCC Group's Section 5.8 Rights. But, just because CCC Group had these rights does not mean that CCC Group exercised them. *See Texas Commerce Bank–Hurst, N.A. v. U.S.*, 703 F.Supp. 592, 594–95 (N.D. Tex. 1988) (distinguishing between the existence of a contractual right of set-off and the exercise of this right and concluding that though a bank had the right of set-off against a taxpayer's funds on deposit in the bank, the bank did not exercise that right until after the levy of the federal tax lien), *aff'd* 896 F.2d 152 (5th Cir. 1990).

The trial court did not ask the jury whether CCC Group exercised any of its Section 5.8 Rights or whether any such exercise was proper. On appeal, CCC Group does not assert that it exercised any of these rights. CCC Group does not

44

contend that the trial evidence conclusively proved that CCC Group exercised one of its Section 5.8 Rights.[16] Instead, CCC Group asserts that because section 5.8 gave CCC Group the right to withhold payment from J.P. Mack or reject a J.P. Mack payment application, J.P. Mack was not entitled to recover on its breach-of-contract claim against CCC Group as a matter of law. This contention fails as a matter of law under the unambiguous language of the Subcontract. The fact that CCC Group had the right to exercise one of its Section 5.8 Rights does not mean that CCC Group did so. *See Texas Commerce Bank–Hurst, N.A.*, 703 F.Supp. at 594–95. CCC Group does not cite any evidence showing that CCC Group exercised one of its Section 5.8 Rights. The jury did not find that CCC Group properly exercised one of its Section 5.8 Rights, and CCC Group does not argue that the trial evidence conclusively proved this point. Thus, we reject CCC Group's contention that its entitlement to exercise one of its Section 5.8 Rights means that J.P. Mack was not entitled to recover on its breach-of-contract claim against CCC Group as a matter of law. *See id.*

Having concluded that each of CCC Group's arguments under its second issue lacks merit, we overrule the second issue. CCC Group has not shown that this court should reverse the parts of the judgment based on J.P. Mack's breach-of-contract claim and render judgment that J.P. Mack take nothing on this claim.

### D. Has CCC Group shown that this court should reverse the parts of the judgment based on J.P. Mack's breach-of-contract claim and remand?

At the charge conference, CCC Group first objected to Question 7 based on the rule requiring proof that remedial damages are reasonable and necessary. CCC Group then stated that if the trial court overruled this objection, CCC Group

---

[16] Even if CCC Group had asserted that the trial evidence conclusively proved that CCC Group exercised one of its Section 5.8 Rights, we would conclude that the trial evidence did not conclusively prove this point.

requested that the trial court submit to the jury CCC Group's proposed Question 7. The trial court overruled the objection and refused the request. Under its third issue, CCC Group asserts that the trial court erred by refusing CCC Group's requested submission of its proposed Question 7.

In the Question 7 submitted to the jury, the trial court asked the jury what sum of money, if any, if paid now in cash, would fairly and reasonably compensate J.P. Mack for its damages, if any, that resulted from CCC Group's failure to comply with the Subcontract. In CCC Group's proposed Question 7, the trial court would have asked the jury to determine the amount of Enduro's damages, rather than the amount of J.P. Mack's damages. In CCC Group's proposed Question 7, the trial court would have asked the jury to make a damage finding based on the "Unpaid balance of the contract" as well as a damage finding based on the "Reasonable cost of J.P. Mack's work performed above the contract balance." We conclude that the proposed Question 7 was not in substantially correct form and that therefore the trial court did not err in refusing to submit this question to the jury. *See Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 791 (Tex. 1995); *I.E. Miller Fowler Trucking, LLC v. B-C Equipment Sales, Inc.*, No. 13-06-00580-CV, 2008 WL 2292636, at *6 (Tex. App.—Corpus Christi Jun. 5, 2008, no pet.) (mem. op.). Therefore, this argument lacks merit.

Under its sixth issue, CCC Group argues that if this court reverses the trial court's judgment in favor of J.P. Mack on its breach-of-contract claim against CCC Group or reduces J.P. Mack's damages, then J.P. Mack would not be a prevailing party, and therefore this court should reverse the trial court's award of attorney's fees in favor of J.P. Mack. Having already concluded that all of CCC Group's other challenges to the trial court's judgment in favor of J.P. Mack and against CCC Group lack merit, this court has not determined that the trial court's judgment

46

in favor of J.P. Mack on its breach-of-contract claim against CCC Group should be reversed or that J.P. Mack's damages should be reduced. Therefore, the condition of this argument has not occurred, and this argument provides no basis for reversing the trial court's judgment.

CCC Group has not shown that this court should reverse the parts of the judgment based on J.P. Mack's breach-of-contract claim and remand.

## III. CONCLUSION

The provision of complete invoices and delivery tickets to CCC Group for Goods or Services is a condition precedent to any obligation of CCC Group to issue a check jointly payable to J.P. Mack and Enduro for the Goods or Services. Under the plain, ordinary, and generally accepted meaning of the term, a "complete invoice" for siding must describe the siding and state the price charged for the siding by Enduro. The trial evidence does not conclusively prove that CCC Group waived the Complete Invoices Condition. The trial evidence is legally insufficient to support a finding that the Complete Invoices Condition occurred, and thus the trial evidence is legally insufficient to support the jury's finding in response to Question 1 that CCC Group failed to comply with the Joint Check Agreement. We have sustained the part of CCC Group's first issue in which CCC Group asserts that this court should reverse the trial court's judgment against CCC Group on Enduro's breach-of-contract claim based on (1) the failure of the trial evidence to conclusively prove that CCC Group waived the Complete Invoices Condition, and (2) the legal insufficiency of the trial evidence to support a finding that the Complete Invoices Condition occurred, and thus the legal insufficiency of the trial evidence to support the jury's answer to Question 1. We also have sustained CCC Group's argument under its sixth issue that this court should reverse and render judgment that Enduro take nothing on its request for attorney's fees under Chapter

47

38 of the Texas Civil Practice and Remedies Code.

Because the trial evidence is legally insufficient to show that CCC Group failed to comply with the Joint Check Agreement, the evidence likewise is legally insufficient to support a finding that Enduro suffered injury by relying on CCC Group's promised performance in the Joint Check Agreement. Therefore, we have concluded that as a matter of law Enduro is not entitled to judgment against CCC Group based on Enduro's fraud claim, and we have sustained CCC Group's fifth issue.

Having determined that the trial evidence is legally insufficient to support an essential element of Enduro's breach-of-contract claim and an essential element of its fraud claim, we reverse the parts of the trial court's judgment in which the trial court rendered judgment in favor of Enduro and against CCC Group, and we render judgment that Enduro take nothing against CCC Group.

Having found no merit in each of CCC Group's challenges to the parts of the trial court's judgment in which the trial court rendered judgment in favor of J.P. Mack and against CCC Group, we affirm the remainder of the trial court's judgment.

/s/     Randy Wilson
        Justice

Panel consists of Justices Jewell, Spain, and Wilson (Spain, J., concurring).